

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**EVANS FANOR,**

        Plaintiff,

v.

**OFFICER CARLOS ALVARADO**
**Individually and in his capacity as**
**An officer with the NEWARK**
**POLICE DEPARTMENT, and the**
**City of NEWARK,**

        Defendants.

CIVIL ACTION No. 05-5536 (PGS-ES)



## BACKGROUND

In or about March 2004, Defendant Alvarado appeared at plaintiff's employment in the Emergency Room with a prisoner, Defendant Alvarado refused to move away from the prisoner patient to allow space for the emergency room nurse to triage the patient. Plaintiff was present during the nurse's requests to defendant Alvarado to move away to allow sufficient space to triage the prisoner patient. Defendant Alvarado's refusal to move away during a medical assessment resulted in the Emergency Room Nurse Manager contacting Defendant Alvarado's superior. Defendant Alvarado became upset that he was reported to his superior. He became belligerent and approached plaintiff in an angry and intimidating manner with his hand on his gun. Defendant Alvarado demanded Plaintiff's name and when plaintiff gave his I.D., Defendant Alvarado snatched it out of plaintiff's hand then threw it on Plaintiff's desk.

A month later, Defendant Alvarado appeared a few more times at plaintiff's work with different prisoner patients and would point to and look at plaintiff, shake his head and laugh at plaintiff in a sarcastic and belittling manner to intimidate Plaintiff.

On May 8, 2004 Defendant Alvarado appeared at Plaintiff's employment again. Defendant Alvarado was using his cell phone in the Emergency Room area. Pursuant to issue No. 831-200-098 of the Policy & Procedure manual of the University, cellular phone usage is prohibited in patient areas. Document provided. Plaintiff duties included enforcing policies in the Emergency Room; therefore Plaintiff informed Defendant Alvarado that cell phones were prohibited in that area. Defendant Alvarado poked his index finger in Plaintiff's face and said "I'm sick and tired of you always trying to tell me what to do." Plaintiff told Defendant Alvarado to stop poking him in the face. Defendant Alvarado responded by grabbing Plaintiff's jacket from the front, pinching Plaintiff's skin and hurting Plaintiff, causing Plaintiff to raise his voice to demand him to let him go. Defendant Alvarado then grabbed Plaintiff's left arm, twisted it and forcefully pushed it upwards and held plaintiff in that position. Defendant Alvarado handcuffed Plaintiff and he took off Plaintiff's tie, belt, watch and shoelaces while laughing at Plaintiff.

3

Defendant Alvarado took Plaintiff to another room and then leaned into Plaintiff's face and told Plaintiff "Shut the FUCK up Bitch." Later, as defendant Alvarado took Plaintiff to the squad car, he gleefully said "I got you!" In response to plaintiff informing Defendant that he would contact I.A.D. and the D.A.'s office, Defendant Alvarado informed Plaintiff "Go Fuck Yourself! They are not going to do jack shit to me, they would never take your word over mine."

At the Eastern District Precinct, Defendant Alvarado refused Plaintiff's requests to make a phone call or for the number to I.A.D., refused to allow Plaintiff to use the bathroom for two hours since his initial request and continually harassed Plaintiff while he was imprisoned by accusing him of threatening him. Plaintiff was incarcerated for two and a half days jointly in the Eastern District Police Station and at the main jail located at 31Green Street. Plaintiff was refused a phone call, a shower, no toothbrush and no access to a social worker the whole time he was incarcerated. Plaintiff was charged with terroristic threat, obstructing, resisting arrest, and disorderly conduct.

As a direct and proximate result of the actions on the part of the Defendants, Plaintiff lost time from work, lost salary,  lost his freedom for two and a half days, missed celebrating mother's day with his terminally ill mother during his imprisonment, was dizzy, nauseous, was in unsanitary conditions in the cell, suffered headaches, stomachaches, feared losing his job, presently has anxiety and fears every time he sees a police officer, suffers sleeplessness, plaintiff had arthroscopic surgery on his right knee, Plaintiff had abdominal surgery, Plaintiff is tended to by a psychologist on a weekly basis, Plaintiff attend physical therapy three times per week, Plaintiff is tended to by a urologist on a daily basis due to the offset of erectile dysfunction after the incident, unable to have sexual intercourse, unable to exercise, unable to go biking, swimming, etc. since the incident due to severe body ache and pain. Document provided.

As a direct and proximate result of the actions on the part of the Defendants, Plaintiff has or is currently on these medications: Ambien 10 MG TAB, Viagra 50 MG TAB, Etodolac ER 500 MG TAB, Naproxen 500 MG TAB, Ibuprofen 400 MG TAB, Cialis 20 MG TAB, Cyclobenzaprine 10 MG TAB, and Hydrocodone/APAP 7.5/ 750 (WATS).

As a result of the false charges of Defendant Alvarado, Plaintiff was incarcerated in jail, was obliged to expend money to defend himself and to procure sureties for his release for his bail at $25,000.00, and remained at large under bail until the Grand Jury of Essex County returned a "No Bill" on said false complaint brought and prosecuted by Defendant Alvarado against Plaintiff. Document provided.

By reason of the false and malicious prosecution, Plaintiff was injured in body and mine, was prevented from following his customary pursuit in his usual occupation, has suffered greatly in his credit and reputation, and has expended large sums of money in his defense. Plaintiff was deprived of his personal liberty, suffered great physical pain and anguishes of mind, and was greatly damaged.

As a proximate result of the excessive force. Plaintiff has sustained permanent injuries and has incurred medical bills and other expenses. These injuries have caused and will continue to cause Plaintiff great pain and suffering, both mental and physical.

4

I reviewed Corporation Counsel Motion for summary judgment; Plaintiff consider the evidence and inferences to be drawn therefore in the light most favorable to the nonmovant. <u>Olabisiomotosho v. Houston</u>, 185 F. 3d 521, 525 (5th Cir. 1999).

Plaintiff believed the appropriate rule is set forth in 6 Moore's Federal practice 56.15 (4), (2d ed. 1965), wherein it is stated:

'The general and well settled rule is that the court should not resolve a genuine issue of credibility at the hearing on the motion for summary judgment, whether the case be a jury or court case; and if such an issue present, the motion should be denied and the issue resolved at trial by the appropriate trier of the facts, where, to the extent that witnesses are available, he will have the opportunity to observe their demeanor. ***' <u>Sartor v. Arkansas Natural Gas Corp.</u> (1944) 321 U.S. 620, 64 S. Ct. 724, 88 L. Ed. 967, 7 F.R. Serv. 56 c. 41.

Plaintiff asserts that he raised a genuine issue of material facts concerning the use of excessive force by defendant Alvarado. Defendant Alvarado has a history of using excessive force, as exemplified by his Internal Affair's file. Plaintiff contend that the "Inaction" of the Newark Police Department to sufficiently discipline defendant Alvarado for his misconduct and abusive ways as a Newark Police officer allowed him on the path of continuously violate the constitutional rights of those he sworn to protect. Officer Alvarado was cited numerous time to Internal Affair's for the usage of excessive force, while Internal Affair's continuously exonerated him. The City of Newark and the Newark Police Department are Policy Makers; therefore they are directly and indirectly responsible for defendant Alvarado's action.

The Plaintiff assert that he produced summary judgment evidence sufficient to establish a genuine issue of material fact concerning municipal liability, i.e., evidence of a municipal policy or custom that was causally linked to the alleged violation of plaintiff's constitutional rights.

It has been stipulated to that Defendant, Carlos Alvarado, was at all times relevant hereto an officer of the Newark Police Department and therefore an agent of Co-Defendant, the City of Newark. The city of Newark is a "Person" within the meaning of 28 U.S.C. 1983. Violation of one's 4th amendment right is a violation of his or her constitutional rights. 28 U.S.C. 1983 provides that if such depravations should occur those persons responsible "Shall be liable to the party injured in an action at law."

As a direct and proximate result of the aforementioned battery of the plaintiff by the Defendant, the plaintiff sustained injury to various portions of his body resulting in plaintiff having to expend money for medical care and treatment; resulting in plaintiff experiencing pain suffering, mental anguish; and resulting in plaintiff becoming disabled and disfigured, all of which can be substantiated by plaintiff's medical record. The tort of assault is a claim for which relief may be granted.

Plaintiff's damages stemming from a common nucleus of operative facts, by Defendant Alvarado as agent of Co-Defendant City of Newark, allows for this court to hear all the claims against the Defendant.

As a direct and proximate result of the aforementioned  assault plaintiff sustained injury to various portions of his body resulting in plaintiff having to expend money for medical care and treatment; resulting in experiencing pain, suffering, and mental anguish; and resulting in plaintiff becoming disabled and disfigured, as previously stated, this can be substantiated by Plaintiff's medical record and further testimony of all of the physicians who had and who are currently treating plaintiff for his ailments. The evidence supports that a reasonable finder of

5

fact could find that an assault had occurred and therefore this matter should be heard by the trier of fact and not to be decided by a motion for summary judgment for the Defendants'.

### Fourth Amendment / Fourteenth Amendment & Excessive Force

The Fourth Amendment's proscription of unreasonable seizures of person or the Fourteenth Amendment's guarantee that no state will deprive a citizen of liberty without due process of the law. In 1989, in Graham v. Connor, 490 U.S. 386, 390 (1989) the U.S. Supreme Court resolved the issue as it applied to arrestees by holding that during an arrest, the fourth Amendment provides the proper constitutional standard to assess excessive force claim. The fourth Amendment forbids the use of excessive force during a "seizure" or arrest. An illegal arrest or other unreasonable seizure of a person is itself a violation of the Fourth Amendment

.

In 1985, in Tennessee v. Garner, [471 U.S. 1, 5] 40-7-108 (1982) the U.S. Supreme Court first applied the Fourth Amendment to a suspect's claim of excessive force during a seizure. An officer's use of force becomes excessive when it is objectively unreasonable. The Garner court noted that an application of the Fourth Amendment must balance the nature and quality of the intrusion against the importance of the governmental interests alleged to justify that intrusion.

In 1952, In Rochin v. California, 342 U.S. 165, 72 S Ct. 25, Alr 2d 1396. addressing the claim of an arrestee whose stomach was forcibly pumped by order of his arresting officer, the court held that police conduct which "Shocks the Conscience" offends Fourteenth amendment due process.

In 1973, In Johnson v. Click, 481 F. 2d 1028, 1033 (2d Cir. 1973) the Glick court introduced a four part test to determine precisely when the use of police force shocks the conscience.

In 1989, in Graham v. Connor. The court held that the Fourth Amendment provides the proper constitutional standard to assess claims of excessive force during the course of an arrest.

Two years after Graham, in 1991, the U.S. Supreme Court decided County of Riverside v. McLaughlin, 500 U.S. 44, 47, 56 (1991). In McLaughlin, the court reaffirmed and expanded upon its earlier 1975 decision in Gerstein v. Pugh, 420 U.S. 103, 114 (1975) in which it held that the Fourth Amendment requires a judicial determination of probable cause before the extended detention of suspects following an arrest. The plaintiffs in Gerstein were detained for extended periods without hearings to determine if there was probable cause for the arrests and continued detention. The court held that during the period of pretrial detention, failure to provide detainees with such hearings violated their Fourth Amendment rights.

In 1994, Albright v. Oliver, 510 U.S. 266, 274 (1994) the U.S. Supreme Court pounded another post- Graham interpretation of Fourth Amendment protection. The Fourth Amendment governs claims of malicious prosecution because it was drafted to protect against all pretrial deprivation of liberty.

The substantive due process approach: excessive force claims of pretrial detainees are governed exclusively by the Fourteenth Amendment. In 1993, In Valencia v. Wiggins, 981 F. 2d 1440, 1449 (5th Cir. 1993) the fifth circuit court of appeals held that the due process clause of the Fourteenth Amendment provides the exclusive constitutional standards protecting pretrial detainees from excessive force. Plaintiff was choked to the point of unconsciousness, upon his awakening in handcuffs, he was beaten by police. The court held that the Fourteenth Amendment was appropriate standard because the force was applied after the incidents of arrest were

completed, after the plaintiff had been released from the custody of his arresting officer, and after he had been in detention awaiting trial for a significant period of time.

In <u>Riley v. Dorton</u>, 115 F.3d 1159, 1164 (4th Cir. 1997) the Fourth Circuit court of appeals also held that the Fourteenth Amendment's due process clause provides the exclusive standard governing pretrial detainees' excessive force claims. The continuing seizure approach under the Fourth Amendment continues to provide protection in the Post-Arrest context.

In contrast to those courts relying exclusively on the Fourteenth Amendment to adjudicate excessive force claims in the Post-Arrest context, other circuits have interpreted the Fourth Amendment to provide concurrent protection. For example, in 1997, in <u>United States v. Johnson</u>, (98-1696) 529 U.S. 53 (2000) 154 F. 3d 569. The third circuit court of appeals held that the Fourth Amendment continues to provide protection after a suspect is taken into custody. The defendant argued that the district court erred by applying the Fourth Amendment because the arrest was over when he applied the force. Without determining the precise point at which an arrest ends and pretrial detention begins, the court adopted the continuing seizure concept. According to the court, the stationhouse beating occurred while the arrest was still in progress and was therefore governed by the Fourth Amendment as the Johnstone court interpreted Graham to hold that an arrest is a continuing event because the force used against Graham occurred after police took him into custody. The Johnstone court observed that a seizure can be a process or continuum, which is not necessarily a discrete moment of initial arrest.

In <u>Moore v. Novak</u>, 146 F. 3d 531, 535 (8th Cir. 1998) the eighth circuit court of appeals found that the fourth Amendment continues to protect the accused from excessive force in the Post-Arrest context.

In Austin v. Hamilton, the tenth circuit court of appeals held that the end of an arrest does not preclude application of the Fourth Amendment. There, the plaintiffs' complaint alleged that following their arrest for Marijuana possession, they were repeatedly assaulted without provocation, denied water, refused restroom access, and forced to remain overnight in the clothes they subsequently soiled.

The Austin court recognized that there are different points along the "Custodial Continuum" along which variable constitutional standards attach this continuum runs through initial arrest, pre-hearing custody, pretrial detention, and post-conviction incarceration.

The U.S. Supreme court's decisions in <u>Gerstein v. Pugh</u> and county of <u>Riverside v. McLaughlin</u>, the Fourth Amendment provides the standard to assess the constitutionality of prolonged, post-arrest custody of pretrial detainees.

Austin, Gerstein, the U.S. Supreme court applied the Fourth Amendment to assess the duration of post-arrest, pre-arraignment custody.

Although, Gerstein and McLaughlin pertained to the duration of, and legal justification for, prolonged custody of pretrial detainees, the court observed that the requirements of the Fourth Amendment apply broadly to the rights of suspect's incident to their detention pending trial, not simply the duration of and justification for that detention.

7

The McLaughlin court explicitly recognized that the Fourth Amendment continues to protect pre trial detainee past the point of initial-arrest. The court acknowledged that the Fourth Amendment can protect pretrial detainees up to four days following an arrest.

Although Graham cast doubt on whether the court would continue to apply the Fourth Amendment past the point of initial arrest, McLaughlin re established the court's broad interpretation of the Amendment's breadth.

Under the case of Bell v. Wolfish, 441 U.S. 520, 557 (1979). The due process clause protects pretrial detainees from excessive force that amounts to punishment. The Bell court relied on the due process clause of the Fourteenth Amendment to provide pretrial detainees with protection analogous to that supplied by the Eight Amendment. The court's decision in Albright, Gerstein, and McLaughlin clearly demonstrate the Fourth Amendment does, in fact, apply to pretrial detainees.

The court's pronouncements in Bell and Graham that after a prolonged period of Custody, pretrial detainees' excessive force claims must be brought under the due process clause of the Fourteenth Amendment. Under the hybrid approach, Fourth Amendment protections end after a probable cause hearing. Thus, that Graham and Bell require individuals detained for extended periods to bring excessive force charges under the Fourteenth Amendment is perfectly consistent with the hybrid approach. This approach would also apply the Fourteenth Amendment because under Gerstein and McLaughlin those suspects would have already received probable cause hearing.

In Riley v. Dorton, 115 F. 3d 1159, 1164 (4th Cir. 1997). The most logical point at which to cut off fourth Amendment protections following an arrest would be when the suspect leaves the custody of his or her arresting officer.

Plaintiff held that the question of probable cause in a section 1983 damage suit is one for the jury. Patzig v. O'Neil, 577 F. 2d 841, 848 (3d Cir. 1978).

## Municipality Liability

Plaintiff understands that under 42 U.S.C. 1983, Municipal defendants cannot be held liable under a theory of respond eat superior; Municipal liability only arises when a constitutional deprivation results from an official custom or policy. Monell v. Department of Social Servs. Of the City of New York, 436 U.S. 658, 691-94 (1978).

A municipality's failure to train police officers only gives rise to a constitutional violation, when that failure amounts to deliberate indifference to the rights of persons with whom the police came into contact. City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). A failure to train, discipline or control can only form the basis for section 1983 Municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a **prior pattern** of similar incidents and circumstances under which the supervisor's actions or inactions communicated a message of approval to the offending subordinate. Boneberger v. Plymouth Township, 132 F. 3d 20, 25 (3d Cir. 1997). Defendant Alvarado has a pattern of using excessive force repeatedly as indicative of the numerous complaints in his Internal Affair's file. The Newark Police Department would repeatedly exonerated Defendant Alvarado, therefore indirectly consenting to his pattern of abuse toward the community.



Plaintiff claims against the municipal defendants rest on allegations that these defendants are directly responsible for defendant Alvarado's action (as exemplified by officer Alvarado's Internal Affair's file-repeatedly reported for excessive force usage while he is continuously exonerated by the Newark Police Department.) and that they failed to adequately train, discipline or control Defendant Alvarado which gave him the opportunity to harass and unlawfully detain plaintiff and other complainants.

Plaintiff conviction was brought about through fraud or coercion, precisely the type of conduct which 1983 was created to guard against. 1983 is used to sue for false arrests and malicious prosecution and makes it unlawful for anyone acting under the authority of state law to deny another person of his/her constitutionally guaranteed rights.

Plaintiff file his claims under section 1983 for false arrest/false imprisonment, excessive force, and malicious prosecution and on plaintiff claims under state law for false imprisonment and malicious prosecution. A detention on the basis of a false arrest presents a viable section 1983 action. <u>Reeves v. City of Jackson, 608 F. 2d 644 (5th Cir. 1979)</u>. (Section 1983 claims for false arrest and false imprisonment presented where, without probable cause, officers arrested and detained stroke victim in belief he was intoxicated).

### Qualified Immunity and Claims Under 1983

Qualified Immunity clause is shut down if a district court found that genuine factual disputes exist. We use a two-step approach to analyze qualified Immunity claims. <u>Price v. Roark</u>, 256 F. 3d 364, 369 (5th Cir. 2001). First, we "consider whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officers conduct violated a constitutional right." Citing <u>Saucier v. Katz</u>, 121 S. Ct. 2151, 2156 (2001). If plaintiff's allegations could make out a constitutional violation, we then "ask whether the right was established- that is, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (Quoting Saucier, 121 S.Ct. at 2156). If after viewing all of the evidence most favorable to plaintiff and that reasonable public officials can not differ on the lawfulness of the defendant's actions, the defendant is not entitled to qualified immunity. Qualified Immunity for individuals must be pleaded and proved. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d396 (1982).

Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Vinyard v. Wilson</u>, 311 F. 3d 1340, 1346 (11th Cir. 2002) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).

"The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F. 3d 1188, 1194 (11th Cir. 2002). To receive qualified immunity, "The public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, supra.

The threshold inquiry a court must undertake in a qualified Immunity analysis is whether (The) plaintiff's allegations, if true, establish a constitutional violation." <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508 (2002) (citing 878 Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001)). However, "If a constitutional right would

have been violated under the plaintiff's version of the facts, the next, sequential step is to ask whether the right was clearly established." Vinyard, 311 F. 3d at 1346 (quoting saucier, 533 U.S. at 201, 121 S. Ct. 2151).

To hold the governmental employer liable for such claims it must be established that the actions of the governmental entity either through an express or implied policy or custom, or through failure to properly train its officers, must be viewed as the moving force of the Constitutional violation. Monell v. Dept. of Soc. Serv. 436 U.S. 658, 98 S. Ct. 2018 (1978).

A warrant less arrest without probable cause violates the Fourth Amendment and forms the basis for a 1983 claim. Marx v. Gumbinner, 905 F. 2d 1503, 1505 (11th Cir. 1990). "For probable cause to exist …an arrest must be objectively reasonable based on the totality of the circumstances." Lee, Supra at 1195.

A police officer is entitled to qualified immunity if he had arguable probable cause for the arrest or applied for an arrest warrant in good faith. Moore v. Gwinnett County, 967 F. 2d 1495 (11th Cir. 1992).

To ultimately prevail on his section 1983 of false arrest and false imprisonment claim, plaintiff must show that defendant Alvarado did not have probable cause to arrest plaintiff. Brown v. Lyford, 243 F. 3d 185, 189 (5th Cir. 2001). ("The constitutional torts' of false arrest… and false imprisonment… require a showing of no probable cause."). Probable cause exists "When the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient to conclude that the suspect had committed or was committing an offense." Glenn v. City of Tyler, 242 F. 3d 307, 313 (5th Cir. 2001). Therefore, defendant Alvarado is not entitled to qualified immunity if a reasonable officer in his position would not have arrived at the same conclusion for an arrest, plaintiff did not commit any offense that warranted him to be arrested. According to a statement made by a witness for the defense, Security Officer Ellis Haynes, "The undersigned officer did not witness or hear Mr. Evans Patient Advocate made any type of terroristic threat toward the Newark Police Officer while assigned to the UH Emergency Room Crisis Unit". Officer Haynes being less then three feet away from the place of the incident would have definitely heard plaintiff making such a statement if defendant Alvarado was telling the truth. The only person who "allegedly" heard plaintiff making such a threat is Officer Alvarado and his partner. Document provided. Later, as Defendant Alvarado took plaintiff to the squad car, he gleefully said "I got you!" In response to plaintiff informing Defendant that he would contact I.A.D. and the D.A.'s office, defendant Alvarado informed plaintiff "Go Fuck Yourself! They are not going to do jack shit to me, they would never take your word over mine."

### Malicious Prosecution

Malicious prosecution need to produce evidence that would raise a genuine issue of material fact on those claims in order to prevail on the section 1983 Malicious Prosecution claim, Plaintiff must establish, among other things, an absence of probable cause for the initiation of the proceedings against plaintiff. Plaintiff has held that the question of probable cause in section 1983 damage suit is one for the jury. Patzig v. O'Neil, 577 F. 2d 841, 848 (3d Cir. 1978).

A false arrest claim is an intentional tort and requires a showing of (1) an arrest under process of law, (2) without probable cause, and (3) made maliciously. Desmond v. Troncalli Mitsubishi, 243 Ga. App. 71, 532 S.E. 2d 463 (2000). A lack of probable cause exists when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused. Expressly provides that the lack of probable cause shall be a question for the Jury.

The malice necessary to support a claim for false arrest or for malicious prosecution may also be inferred if the defendant's actions were wanton or were done with a reckless disregard for or conscious indifference to the rights of the plaintiff to the rights of the plaintiff- Fleming v. U-haul, 71, 532 S.E. 2d 463 (2000).

False Imprisonment is defined as the unlawful detention of a person, for any length of time, whereby such person is deprived of his personal liberty. The elements of the cause of action are (1) the detention and (2) the unlawfulness there of Barbe v. Collins, 219 Ga. App. 63, 463 S.E. 2d 922 (1995); Scott Housing Systems, Inc. v. Hickox, 174 Ga. App. 23, 329 S.E. 2d 154 (1985).

An action for false imprisonment will lie where a person is unlawfully detained under void process or under no process at all. Miller v. Grand Union Company, 250 Ga. App. 751, 552 S.E. 2d 491 (2001).

Section 1983 provides a civil remedy for persons whose federal constitutional or other federally established rights are violated under color of state law. Section 1983 does not create a new cause of action but rather provides a means by which violations of federally-protected rights can be converted into civil actions for damages. Butts v. Volusia, 222 F. 3d 891 (11th Cir. 2000).

### False Imprisonment and the Application of Qualified Immunity

An unlawful arrest and detention by a police officer affected under color of state law gives rise to an action under section 1983 for depravation of a federally protected right, Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473 (1961); Pierson v. Ray, 386 U.S. 54, 87 S.Ct. 1213 (1967). A false imprisonment claim under 1983 is based on the protection of the Fourteenth Amendment against deprivations of liberty without due process of law as well as the Fourth Amendment's prohibition on unreasonable seizures. Baker v. McCollan, 443 U.S. 137, 142, 99 Sup. Ct. 2689, 2693-94 (1979). Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under 1983 for false imprisonment based upon a detention pursuant to that arrest. Ortega v. Christian, 85 F. 35 1521 (11th Cir. 1996).

### Malicious prosecution and the application of Qualified Immunity

The 11th Circuit has determined that a malicious prosecution can constitute a violation of the Fourth Amendment and a viable constitutional tort cognizable under section 1983. Uboh v. Reno, 141 F. 3d 1000, 1002-04 (11th Cir. 1998); Whiting v. Traylor, 85 F. 3d 581, 584 (11th Cir. 1996); Kelly v. Curtis, 21 F. 3d 1544, 1554-55 (11th Cir. 1994). To establish a federal malicious prosecution claim under section 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution. Uboh, 141 F. 3d at 1002-04; Whiting, 85 F. 3d at 584-86; Kelly, 21 F. 3d at 1553-55.

### Municipal Liability and Qualified Immunity

Governmental entities may be held liable under 42 U.S.C., 1983 only when a governmental "Policy or Custom" is the moving force behind the constitutional deprivation. Farred v. Hicks, 915 F. 2d 1530, 1532-33 (11th Cir. 1990). See also Kentucky v. Graham, 473 U.S. 159, 105 S. Ct. 3099 (1985). The governmental entity's "Policy or Custom 'Must have played a part in the violation of federal law." A local governmental entity may not be held liable for an employee's tortuous acts "unless action pursuant to official municipal policy of some nature caused the constitutional tort." Collins v. City of Harker Heights, 503 U.S. 115, 112 S. Ct. 1061, (1992) (quoting Monell, Supra at 691). Plaintiff claim that defendant Alvarado, as well as the Co-Defendants deprived plaintiff of rights secured by the constitution and such deprivation occurred under color of law. Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970). The Fourth Amendment protects citizens from arrests that are not based on probable cause. U.S. Const. amends IV.

For qualified Immunity to be an applicable defense, the court must determine that an objectively reasonable official would have believed that the action taken or omitted violated that right. Hatch v. Dep't for Children, Youth & their Families, 274 F. 3d 12, 20 (1st Cir. 2001).

In addition to showing the existence of an official policy or custom, Plaintiff must prove "that the municipal practice was the proximate cause of the injuries suffered." Bielevicz v. Dubinon, 915 F. 2d 845, 850 (3d Cir. 1990). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985) and Estate of Bailey by Oare v. County of York, 768 F. 2d 503, 507 (3d Cir. 1985), overruled on other grounds by Deshaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989); see also Bielevicz, 915 F. 2d at 851. Holding that "Plaintiffs must simply establish a municipal custom coupled with causation- i.e., that policy makers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury"); Carswell v. Borough of Homestead, 381 F. 3d 235, 244, (3d Cir. 2004) ("there must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.") (Quoting Brown v. Muhlenberg Township, 269 F. 3d 205, 214 (3d Cir. 2001) (quoting Canton, 489 U.S. at 385)). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Bielevicz, 915 F. 2d at 851. "A sufficiently close causal link between… a known but uncorrected custom or usage and a specific violation are established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." (quoting Spell v. Mcdaniel, 824 F. 2d 1380, 1391 (4th Cir. 1987)); see also A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F. 3d 572, 582 (3d Cir. 2004). The deficiency of a municipality's training program must be closely related to the plaintiff's ultimate injuries.

In the case of claims (such as failure-to-train claims) that require proof of deliberate indifference, evidence that shows deliberate indifference will often help to show causation as well. Reflecting on failure-to-train cases, the court recently observed: The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle, that situation will violate citizens rights could justify a finding that policy makers decision not to train the officer reflected "deliberate indifference", to the obvious consequence of the policy makers choice—namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequences that was so predictable. Board of County Com'rs of Bryan County, OKL. V. Brown, 520 U.S. 397, 409-10 (1997).

Viewing all claims in a light most favorable to the plaintiff, then matter of law, plaintiff is entitled to redress. It has been stipulated to that Defendant, Carlos Alvarado, was at all times relevant hereto an officer of the Newark Police Department and therefore an agent of Co-Defendant, City of Newark. City of Newark is a "Person" within the meaning of 28 U.S.C. 1983. 28 U.S.C. 1983 provides that if such depravations should occur those persons responsible "Shall be liable to the party injured in an action at law."

Plaintiff's damages stemming from a common nucleus of operative facts, the illegal seizure of plaintiff by Defendant Alvarado as agent of Co-Defendants Newark Police Department and the City of Newark, allows for the court to hear all the claims against the Defendants.

## Liability In Connection with the Actions of Another – Municipalities

The tenth circuit has created a three-part test that a plaintiff must prove in order to hold a municipality liable in a 1983 suit: (1) "The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the Municipality's employees"; (2) "Deliberate indifference to or tacit approval of such misconduct by the Municipality's policy making officials… after notice to the officials of that particular misconduct"; and (3) Injury to the plaintiff "by virtue of the unconstitutional acts pursuant to the Municipality's custom and the custom was the moving force behind the unconstitutional acts." Gates v. Unified School district, 996 F. 2d 1035, 1041 (10th Cir. 1993). According to Defendant Alvarado's Internal Affair's file, he was reported several times for his misconduct of excessive force usage, while he was continuously "exonerated". As a result, Defendant Alvarado was allowed to continue on a path of countless violations of the constitutional rights of those he sworn to protect. As Co-agents, the Newark Police Department as well as the City of Newark should assume some responsibility for failing to train, re-train, or sufficiently training and re-training Defendant Alvarado in the hope of preventing future constitutional violations by Defendant Alvarado. Internal Affair's file of Defendant Alvarado indicated that he was problematic and needed help, whether it was through counseling, training or re-training. It is suffice to say that whatever was done or not provided resulted in Defendant Alvarado's approval to continue on the path he is currently on. As Co-agents and Co-Defendants the Newark Police Department, as well as the City of Newark has to assume responsibility directly or indirectly for the continued misconduct behavioral pattern that they knew Defendant Alvarado displayed on a continuum basis. This is easily proven by Defendant Alvarado's Internal Affair's file. Exhibit D. Local entities are not entitled to immunity. Owen v. City of Independence, 445 U.S. at 657. According to the case of St. Hilaire v. City of Laconia, 71 F. 3d 20, 24  (1st Cir. 1995) Mistakes are precluded from---- deemed unreasonable, incompetence is not. "Qualified immunity protects all but----- incompetent or those who knowing violate the law." Anderson v. Creighton 635, 638 (1987), quoting Malley v. Briggs, 475 U.S. 335, 341 (1986).

In Albright v. Oliver, 510 U.S. 266, 274 (1994).The Albright court held that "Post-Arrest restraints should be viewed as Fourth Amendment violations.

## Standard for a Motion to Dismiss

"The court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any set of facts consistent with the complaint" Brown v. Budz, 398 F. 3d 904, 908-909 (7th Cir. 2005). '[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the

plaintiff to relief, dismissal under Rule 12(b) (6) is inappropriate.' Brown, 398 F. 3d at 908" <u>Key v. Illinois Dept. of State Police</u>, 2006 WL 3229999 (C.A. 7[th] 1999).

Plaintiff provide sufficient evidence to meet the threshold requirement of the burden of production, therefore the trier of fact could decide that plaintiff is entitled to relief and this matter should proceed to trial.

### Credibility and Controversy

Defendant Alvarado's event on what transpired on May 8, 2004 denotes some credibility issues that should be carefully examined by a jury of a court. Noting Defendant Alvarado's Internal Affair's file cite numerous and various infractions dealing with excessive force usage, by the citizens whom he sworn to protect. To understand Defendant Alvarado in his functions as an official of the Newark police Department, as well as an official that falls under the municipality of the City of Newark one need not go further then his Internal Affair's file. Document provided.

Therefore, as the Defendants have not met the threshold to have this matter decided by summary judgment because there are a great deal of controversial facts, this matter should be decided by a formal proceeding in the court of law by a jury.

### FACTS v. FICTIONS

Plaintiff was charged with terroristic threat, obstructing, resisting arrest, and disorderly conduct. The Essex County Grand jury the week ending august 30, 2004 refused to indict on the charges of Terroristic Threat, Obstructing and Resisting arrest. On February 4, 2005 Chief Judge Shaka Taylor dismissed the charge of Disorderly Conduct.

Plaintiff had two major surgeries, with one possibly pending. On September 29, 2006 plaintiff was operated on by Dr. Pratibha Vemulapalli for an inguinal hernia. On October 30, 2006 Plaintiff was operated on by Dr. Melvin Adler for a tear of the anterior horn of the lateral meniscus.

On March 13, 2007 I was informed by Dr. Sharan that my MRI examination revealed that I had a very large herniated disc on my lumbar spine with significant compression of my S1 nerve roots. Dr. Sharan advised me that if the pain continued that either epidural injection or surgical decompression is needed. Dr. Sharan told me with the significant of pain that I was experiencing; most likely surgery would be the best route to take.

Since the incident, plaintiff is tended to by various physicians. Plaintiff is in Physical Therapy three times a week. Plaintiff is tended to by a psychologist on a weekly basis. Plaintiff is tended by an Urologist on a daily basis.

To deal with daily pain and suffering plaintiff has or is currently on these medications: Ambien 10 MG TAB, Viagra 50 MG TAB, Etodolac ER 500 MG TAB, Naproxen 500 MG TAB, Ibuprofen 400 MG TAB, Cialis 20 MG TAB, Cyclobenzaprine 10 MG TAB, and Hydrocodone/APAP 7.5/750 (WATS). I take a host of medication to ease my pain and suffering at times I am in so much pain that I have to take my Ambien medication to be able to sleep.

Since my encounter with defendant Alvarado, I have experienced an erectile dysfunction problem, as a direct result I am currently taking Viagra. My Urologist interchanged me on Cialis 20 MG TAB, another erectile dysfunction medication. This is done, to see which medication is best for me.  Recently, My Urologist has also referred me to a sex therapist.

The Assistant Corporation Counsel often referred to plaintiff serious injuries as "Alleged Injuries". Even if Plaintiff was an actor, Plaintiff would not be able to fake injuries to the point of two past "Major Surgeries" possibly with another surgery down the road. Even an Oscar awarded actor would NOT be able to FAKE INJURIES to the point of two major surgeries and possibly one down the road.

Defendant Alvarado alleged that plaintiff shouted terroristic threat at him in the present of three witnesses. With the exception of his Partner, officer Lijo, no one heard plaintiff making "alleged" threat at Defendant Alvarado.  "This Suspect Screamed REPEATEDLY At The Undersigned "You Don't know who hell I am!" "I Told You Get Off The Phone!" That During The Prisoner's Restance He Had Stated "You Wait And See What Will Happen To You And Your Family!" Prisoner was Placed Into A Secured Room Where He Continued To Be Verbally Abusive To The Undersigned In View Of The Hospital (Witnesses) Suspect Continued To State "I Will Fucking Kill You Mother Fucker, You'll See!" You Don't Know who The Fuck I AM!" Statement from other Witnesses in the E.R. provided. If Plaintiff was such a raving and shouting Lunatic SCREAMING all kind of terroristic threat in the presence of Defendant Alvarado, his partner, and the other witnesses in the Emergency Crisis area, why is that no one with the exception of Defendant Alvarado and his partner heard these "Alleged" terroristic threat made toward Defendant Alvarado and his family? Exhibit E. In The Police Report it is stated that plaintiff was charged with Obstruction of Administration of Law for "alleged" pointing his fingers and hands at Defendant Alvarado? Yet, beside Defendant Alvarado or possibly his partner (?) no one saw plaintiff doing the "alleged" act. In all of the charges that plaintiff was charged with, the only individual who attest to plaintiff committing these "Alleged" acts were Defendant Alvarado and his partner. Document provided. Charges were subsequently all dropped by a grand jury and Chief Judge Shaka Taylor. Defendant Alvarado even attempted to charged plaintiff with trespassing as he stated in police report "It Should Further Be

15

Mentioned That This Prisoner Job Title Is Patient Advocate Who Responsibility Is To Front Entrance Solely And As Per The Duty RN R. Rosheter He Had No Reason For Being In The Secured Crisis Room." As function of my responsibilities, I have total access to the "Entire" Emergency Room area. Defendant Alvarado wanted to charged plaintiff because plaintiff was doing his job according to his job function. This is exemplified by plaintiff job function. Job Function provided. In addition, plaintiff would never make such terroristic threat to a police officer. Plaintiff comes from a family of Law Enforcement. Plaintiff brother, Yves Phanor was a "Decorated" Miami Dade County officer who was killed while participating in a GOOD WILL MISSION to restore DEMOCRACY to the Island of Haiti. Plaintiff would never make such a comment to a law enforcement "brethren" especially when my family and I are still suffering from this devastating tragedy. Document provided.

In the police report, it state's that prisoner refused phone call at 2010 Hours. Document provided. That is a total fabrication. Plaintiff has never been arrested and in trouble with the law, why would plaintiff refused the "only" option of getting out of jail? Especially, when Jail is not a place that plaintiff is accustomed to. To make matters worst the following day was Mother's Day, and my mother was terminally ill with cancer. This was possibly one of the last Mother's Day Celebration that I will share with my mother, why on God's Green Earth would I refused the "ONLY" way out of getting out of jail to be with my "MOM". No "Reasonable" person would phantom that a person in jail who had a terminally ill family member would refuse the only way out of jail. I was refused a telephone call, only because I told Defendant Alvarado that I was going to report him to I.A.D. and the D.A.'s office for his misconduct. Through lie and malice intent Defendant Alvarado successfully kept me plaintiff from celebrating one of the last Mother's Day celebrations that my mother had on this earth before her passing. Unfortunately, my mother succumbed to her illness on April 13, 2006. Document provided.

During the deposition stage in one of the interrogatory questions, plaintiff asked Corporation Counsel "Has any one ever accused Carlos Alvarado, as an officer or civilian, of using unreasonable and or excessive force on or off the job (Newark Police Department)? To which they answered yes. It was after the Honorable Ronald J. Hedges, U.S.M.J. instructed Corporation Counsel to release partial segment of Defendant Alvarado's Internal Affair's file. After reviewing defendant Alvarado's Internal file, I discovered that defendant Alvarado has a past and present history of violating the constitutional rights of those he sworn to protect with excessive use of force. Defendant Alvarado's misconduct of excessive abuse has gone from bad to worst. I have provided the honorable judges of the U.S. District Court – District of New Jersey with except from Defendant Alvarado's Internal Affair's File. Since the files were released to me, I have taken great steps to protect the content of Defendant Alvarado's file. This is why I am only releasing except of defendant Alvarado's Internal Affair's file only to the honorable judges of the United States District Court- District of New Jersey. Document provided.

## Conclusion

Plaintiff was charged with four infractions by defendant Alvarado. Three of the charges went to a Grand jury and was subsequently dropped. The fourth charge was dismissed by Chief Judge Shaka Taylor. Plaintiff had two major operations and possibly a third operation down the road. Plaintiff is tended by various physicians on a daily basis; Psychologist, Urologist, orthopedic surgeon, Physical Therapist, etc. Plaintiff is taking a host of different medications for his pain and suffering as stated above. Plaintiff pain and suffering is so excruciating, that plaintiff has commenced paperwork to go out on disability sick leave. Plaintiff pain and suffering came after plaintiff's encounter with Defendant Alvarado. When it comes to Defendant Alvarado's past abuse and aggression, His Internal Affair's file speaks the FACTS loud and clear.

**Wherefore, Plaintiff prays that defendants motion for Summary Judgment be Denied on all claim.**

## Table of Contents

**Legal Argument**

Point One - Fourth Amendment/ Fourteenth Amendment & Excessive Force. The fourth Amendment's proscription of unreasonable seizures of person or the Fourteenth Amendment's guarantee that no state will deprive a citizen of liberty without due process of the law.

Point Two - Municipality Liability. Failure to train police officer's only give rise to a constitutional violation...

Point Three – Qualified Immunity. Clause is shut down if a district court found genuine factual disputes exist.

Point Four – Malicious Prosecution. Need to produce evidence that would raise a genuine issue of material fact...

Point Five – False Imprisonment and the Application of Qualified Immunity. An unlawful arrest and detention by a police officer affected under color of state law gives rise to an action under section 1983 for depravation of a federally protected right.

Point Six – Malicious prosecution and the Application of Qualified Immunity. A violation of the Fourth Amendment and a viable constitution tort cognizable under section 1983.

Point Seven – Municipal Liability and Qualified Immunity. Governmental entities may be held liable under 42 U.S.C., 1983 only when a governmental "Policy or Custom" is the moving force behind the constitutional deprivation.

Point Eight – Liability in Connection with the Actions of Another – To hold a Municipality liable in a 1983 suit...

Point Nine – Standard for a Motion to Dismiss. If Plaintiff is able to prove his case, then the Court should not dismiss case.

Point Ten – Credibility and Controversy. Should be carefully examined by a Jury of a court.

Point Eleven – Facts v. Fiction. Plaintiff's ordeal.

**Conclusion**

OFFICE OF THE PROSECUTOR
COUNTY OF ESSEX
ESSEX COUNTY NEW COURTS BLDG
NEWARK NJ 07102-0000
FAX: 973-621-6150
973-621-4700

EVANS  FANOR
156 IVY ST
NEWARK NJ 071020000

OFFICE OF VICTIM-WITNESS ADVOCACY
AUGUST 30, 2004
PROSECUTOR FILE #:  04-004240
MUNICIPAL DOCKET #:  002

STATE VS.  FANOR
RE:  EVANS  FANOR

DEAR EVANS  FANOR

THE  ESSEX  COUNTY  GRAND  JURY  HAS  REVIEWED  THE  ABOVE MATTER AND CONSIDERED THE EVIDENCE INVOLVED.  AS A RESULT OF ITS  REVIEW.  **THE  GRAND JURY  DID  NOT  FIND  PROBABLE  CAUSE  FOR  THE  RETURN  OF  AN INDICTMENT.** THEREFORE, CRIMINAL PROSECUTION WILL  NOT BE PURSUED AND THE CASE  WILL  BE CLOSED.    YOUR ASSISTANCE  AS  A  WITNESS  IN  PREPARING  THE  CASE  FOR PRESENTATION TO THE GRAND JURY IS  GREATLY APPRECIATED.

· WE ARE SORRY WE CANNOT GO INTO  DETAIL AS TO WHY THE  GRAND  JURY  DID NOT  INDICT   IN  THIS  CASE,  SINCE BY STATUTE THE PROSECUTORS  NOT PERMITED TO DISCUSS THE PROCEEDINGS OF THE GRAND JURY.   WE CAN SAY,   HOWEVER,  THAT THE  USUAL  REASON FOR REFUSAL TO AUTHORIZE CRIMINAL CHARGES IS  THAT THERE IS  INSUFFICIENT  EVIDENCE.

TO INQUIRE ABOUT THE RETURN OF PROPERTY HELD IN  EVIDENCE  OR  IF  YOU HAVE  ANY  QUESTIONS, PLEASE CONTACT THE OFFICE OF VICTIM-WITNESS ADVOCACY AT 973-621-4687.

THANK YOU FOR YOUR CONTINUED INTEREST AND COOPERATION.

VERY TRULY YOURS,

PAULA T DOW,  ACTING
COUNTY PROSECUTOR

PAMELA M MCCAULEY
VICTIM-WITNESS COORDINATOR            5

**MONTEFIORE MEDICAL CENTER**

The University Hospital
For the Albert Einstein
College of Medicine

**THE CENTER FOR ORTHOPAEDIC SPECIALTIES AT MONTEFIORE**



**ALBERT EINSTEIN COLLEGE OF MEDICINE OF YESHIVA UNIVERSITY**

ALOK D. SHARAN, M.D.
Chief, Orthopaedic Spine Service
Assistant Professor of Orthopaedic
Surgery

March 13, 2007

Jorge Orellana, M.D.
First Medicare
8707 Flatlands Ave
Brooklyn, NY 11236

Re:    Evans Fanor
Date of Birth: 01/30/1970
Date of Visit:  March 13, 2007

Dear Dr. Orellana:

Thank you very much for this kind consultation on Evans Fanor.  As you know, Mr. Fanor is a pleasant 37-year-old gentleman who unfortunately has been suffering from significant pain in his back with radiation down both of his legs for over 6 months now.  He does have some numbness and tingling associated with this.  Most of the pain is in his legs, although he has a significant component in his back.  No difficulty with bowel or bladder symptoms, just has this back pain. He has had right knee surgery previously, which has helped his knee pain, but has not helped his back pain.  Standing, walking, leaning forward, lying on his side, lying on his back, lying on his stomach aggravates his pain, where as sitting helps relieve his pain.  He has tried muscle relaxants, narcotic pain medications, hot packs, and ice, which have been somewhat helpful for him.

**Past Medical History:**  Significant for diabetes.

**Past Surgical History:**  Includes abdominal surgery and knee surgery.

**Medications:**  Viagra, Ibuprofen, Zyrtec, Glucovance, and Ambien.

**Allergies:**  Seasonal.

**Social History:**  Works in Newark at UMDNJ.  He is single and has no children. He lives with his Aunt in a house.  Never smoked, never drank, never had a problem with drug dependence.

The Tower at Montefiore Medical Park
1695 Eastchester Road
Bronx, New York 10461
718-405-8427 Office
718-405-8174 Fax

3400 Bainbridge Avenue 6th Floor
Bronx, New York 10467-2491
718-920-2060 Office
718-325-0678 Fax

Re: Evans Fanor

Family History:  Significant for high blood pressure and diabetes.

Review of Systems:  He notes that he has muscle aches.

**Physical Examination:**  On physical exam, Mr. Fanor walks with a normal gait. When I asked him to stand on his toes, he does have some increased pain.  He does have pain when standing on his heel also.  He has a positive straight leg raise bilaterally.  No pain with internal or external rotation of both of his hips. Testing of his sensation reveals decreased sensation over the dorsum of his right foot.  Motor strength testing reveals 4/5 strength in his dorsiflexors, his EHL on his right foot, also 4/5 strength in his EHL and dorsiflexors on his left side.

**X-rays:**  He had an MRI done of his lumbar spine, which reveals a **large L5-S1 disc herniation with significant compression of his S1 nerve roots.**

**Impression:**  Herniated disc, L5-S1.

**Plan:**  I went over the diagnosis of herniated disc with Mr. Fanor.  I went over the natural history of the herniated disc.  He has had 6 months of pain and has tried physical therapy for 5 months.  I presented the option of an epidural injection or surgical decompression.  At this point, Mr. Fanor is interested in continuing with his physical therapy.  He will come back to see us in 2 months time for further follow up.  If his pain continues to persist at that time, we will obtain a decision of doing either an epidural injection or a surgical decompression.

Thank you again for allowing me to participate in the care of this very kind gentleman.

THIS REPORT WAS ELECTRONICALLY SIGNED

Sincerely,

ALOK SHARAN, M.D
3400 Bainbridge Avenue
Bronx, NY 10467

Alok Sharan, MD

sx
Voice ID#:  6590697





**MONTEFIORE MEDICAL CENTER**
The University Hospital
for the Albert Einstein
College of Medicine

**ALBERT EINSTEIN
COLLEGE OF MEDICINE
OF YESHIVA UNIVERSITY**

PRATIBHA VEMULAPALLI, M.D.
Minimally Invasive Surgery
Bariatric Surgery

September 27, 2006

Re: Evans, Fanor

To Whom It May Concern:

This letter is to certify that the above named patient will be admitted to Montefiore Medical Center on **September 29, 2006**for major abdominal surgery. Mr. Evans has been diagnosed with an inguinal hernia (550.90). The recuperation time for this procedure is approximately 2-3 weeks, however the decision is made once the patient has been seen in the office for their post- operative appointment.

If there is any further information required, please do not hesitate to get in touch with this office at 718-920-4800.

Sincerely,

Pratibha Vemulapalli, M.D.
Department of Surgery
Division of Bariatrics
MMC

Mailing Address:
Montefiore Medical Center
111 East 210th Street
MAP 4th Floor
Bronx, NY 10467-2490

718-920-6228 Office
718-798-1884 Fax
E-mail: pvemulpa@montefiore.org

 
22

MONTEFIORE MEDICAL CENTER
for the Albert Einstein
College of Medicine

THE CENTER FOR
ORTHOPAEDIC SPECIALTIES
AT MONTEFIORE

ALBERT EINSTEIN
COLLEGE OF MEDICINE

MELVIN ADLER, M.D.
Department of Orthopaedic Surgery
Adult Reconstructive Surgery

October 2, 2006

To Whom This May Concern:

Re: Evan Fanor
SS#: 059604017

This is to certify that the above-named patient is under the care of Dr. Melvin Adler since August 17, 2006 for the right knee, which showed on MRI a tear of the anterior horn of the lateral meniscus. (ICD-9: 836.0/836.1)

He is scheduled for arthroscopic surgery of his right knee. At this point, he has limitations in climbing, bending, kneeling and going up and down stairs. After the surgery Mr. Fanor should be out of work for approximately six weeks to recover.

If you have any questions, please contact our office at 718-920-2060

Sincerely,

Raquel Ruiz
Patient Service Liaison

3400 Bainbridge Avenue · 6th Floor
Bronx, New York 10467-2490
718-920-2060 Office
718-325-0678 Fax

23

**Optimum Psychological Services, PLLC**
**833 58th Street, Suite 3R**
**Brooklyn, NY 11220**
**Tel: (718)437-3558 Fax: (718)437-6368**

October 17, 2006

Re: Fanor, Evans (DOB: 1/30/70)

To Whom It May Concern:

Please be informed that Mr. Evans Fanor is currently under my care for treatment of Post-Traumatic Stress Disorder. He receives weekly individual psychotherapy. His prognosis is good if he continues to comply with treatment.

Sincerely,

Eva Ng, Psy. D.
NYS Licensed Psychologist



24

## PHYSICAL THERAPY &
## SPORTS REHAB OF
## NEW YORK, P.C.

1958 UTICA AVENUE, BROOKLYN, NEW YORK 11234

718 - 629-0472
Fax 718 - 629-0482

LEONARD BROWN PT
STUART HOFFMAN OTR
DENNIS SMITH PT

OCT. 25, 2006

TO WHOM IT MAY CONCERN:

MR. EVANS FANOR RESUMED PHYSICAL THERAPY. HE WILL BE COMING FOR
PHYSICAL THERAPY 2 TO 3 PER WEEK DUE TO A TEAR IN HIS KNEE.

SINCERELY,
CAROL
OFFICE MGR

**The University Hospital - Emergency Department**
**150 Bergen St., Newark, NJ 07103**
**Main ED - (973) 972-5123**
**Trauma ED - (973) 972-2664**
**Peds - (973) 972-5139**
**Fast Track - (973) 972-3342**
**Psych - (973) 972-6134**

Patient: Fanor, Evans

DI Printed: 6/28/2004 12:52pm

MD ED: _____

Res/PA/NP: Holloway, Betty APN

RN Dispo: _____

### AFTERCARE INSTRUCTIONS

We are pleased to have been able to provide you with emergency care. Please review these instructions when you return home in order to better understand your diagnosis and the necessary further treatment and precautions related to your condition. Your diagnoses/prescriptions today are:

Dx 1: Bronchitis, Chronic ; Resolving from 6/9/04

Misc Instr 1: Seen and treated for Bronchitis with zithromax Z pack 2 week

Med Instr 1: Tri-Tuss ER one twice daily

### General Information on BRONCHITIS

Bronchitis is an infection of the main air passages in the lungs (bronchi), caused by the growth of certain germs. Anyone can develop bronchitis, but it occurs far more often in people who smoke. In fact, some smokers develop a persistent form of the disease called chronic bronchitis.

What are the symptoms?

Bronchitis often develops after the onset of a common cold. There may be a runny nose, chills, fever, muscle aches and a sore throat. There may also be a sore feeling in the upper chest that gets worse with coughing. In adults, the coughing usually brings up gray or yellow material (sputum, phlegm) from deep inside the lungs.

What can be done?

Some types of bronchitis are caused by germs that can be treated with antibiotic medication, but many types of bronchitis do not improve with antibiotics. Your doctor will determine if antibiotics are appropriate for you.

What are the risks?

Bronchitis usually gets better within several days and does not ordinarily produce any serious medical problems. There are, however, some risks:

1. Occasionally people with bronchitis also develop an infection of the lungs (called pneumonia). This can be a serious problem.
2. Bronchitis frequently worsens the symptoms of asthma, emphysema or heart failure. For people with these conditions, bronchitis can be serious or sometimes even life threatening.

*INSTRUCTIONS*

1) *** DON'T SMOKE! ***
2) Rest.
3) Drink plenty of fluid to help avoid dehydration.
4) If you are not allergic to them, you may take acetaminophen (Tylenol) or aspirin to help ease the pain and lower the fever. WARNING: DON'T GIVE ASPIRIN TO ANYONE LESS THAN 18 YEARS OLD.
5) A cold mist humidifier or vaporizer may help loosen secretions.
6) SEEK IMMEDIATE MEDICAL ATTENTION if you develop a high fever, difficulty breathing, chest pain or cough up blood.

Follow-up 1: Primary Care Physician

F/U MD Ph: _____
F/U MD Fax: _____

Follow-up 1 Date: Call for an Appointment

**The University Hospital - Emergency Department**
**150 Bergen St., Newark, NJ 07103**
**Main ED - (973) 972-5123**
**Trauma ED - (973) 972-2664**
**Peds - (973) 972-5139**
**Fast Track - (973) 972-3342**
**Psych - (973) 972-6134**

**Work/School Excuse**

26

Patient: <u>Fanor, Evans</u>                              <u>6/28/2004 12:52pm</u>
May return to work/school: _____

Restrictions: <u>None</u>

Follow-up 1: <u>Primary Care Physician</u>          F/U MD Ph: _____
                                                    F/U MD Fax: _____

Follow-up 1 Date: <u>Call for an Appointment</u>

*Note to Employer / School Official:*

The patient named above was seen in our Emergency Department today. Recommended restrictions on activity and recommended follow-up are listed above. At the time of the follow-up visit, the physician may decide that further restrictions are necessary.

Signature: _____ *BHollinger* _____

Administration::Management of Environment Care (EC)::Use of Cellular Phones & Other Radio Transmitters in Patient Care Areas - Issue No. 831-200-098

# Use of Cellular Phones & Other Radio Transmitters in Patient Care Areas - Issue No. 831-200-098

| | | | |
|---|---|---|---|
| **Version No:** | 002 | **Date Issued:** | 2/9/1996 |
| **Date Approved:** | 2/9/1996 | **Approved By:** | Administration |
| **Date(s) Revised:** | 2/3/1999, 11/1/2001 | | |
| **Revised By:** | | | |
| **Comments:** | revision | | |

### POLICY AND PROCEDURE MANUAL

| DEPARTMENT: Administration | ISSUE NO.  831-200-098 |
|---|---|
| EFFECTIVE DATE: November 1, 2001 | SUPERSEDES DATE: February 3, 1999 |

**SUBJECT:**

Use of Cellular Phones

**PURPOSE:**

To provide for a safe environment in patient care areas by avoiding interference problems between radio frequency transmission devices and patient care equipment.

**RESPONSIBILITY:**

The Chief Executive Officer, all members of staff, medical and administrative and the Director of Public Safety are to ensure hospital compliance.

**POLICY:**

University Hospital prohibits the use of cellular phones in patient care areas.  Cellular phones should be turned completely off, not in the standby position, before entering any patient care area.  Other hand held radios or communication devices should not be keyed or activated within three (3) feet of the patient care areas.

**PROCEDURE:**

1) The Admitting Department will inform all patients and visitors in areas identified as non use areas that cellular phones or similar devices areas are not permitted.  The nurse manager or their designee for patient care area is responsible for enforcing this policy.

2) **If anyone enters a patient care area and has a radio transmitting device, they are to**



be notified that they must turn off the device before entering the patient care area. Radio transmitting devices include, but are not limited to, cellular phones and walkie-talkies.

3) Signs will be posted outside all patient care areas concerning the ban on radio frequency transmitters. Similar information will also be on the Condition of Admission to the University Hospital form.

| APPROVALS BY: | NAME | SIGNATURE: |
|---|---|---|
| Vice President and Chief Executive Officer | Sidney Mitchell, FACHE | |
| Chief Operating Officer | Marianne McConnell, CHE | |
| Interim Director, Hospital Support Services | Raafat Boles | |



**DEPARTMENT OF PUBLIC SAFETY**

## ADMINISTRATIVE SUBMISSION

CAMPUS ___Nwrk___

TO: ___Sgt. Velverton___

FROM: ___S/o Ellis G Haynes___

SUBJECT: ___Terroristic Threat___     Log # ___56-04___

At the Aboved Complaint Date And time
Mention The Undersigned officer did not
witness or hear Mr. Evans Patient Advocate Made
Any Type of Terroristic Threat toward the
Newark Police officer while Assigned to
the UH Emergency Room Crisis Unit
Report Submitted.

Rank & Signature S/o
Reporting Officer ___Ellis J Haynes___

Rank & Signature
Reporting Supervisor ___

Report Prepared     Time ___1800___     Date ___5/17/04___

Report Approved ___2015___     ___5/17/04___

WHITE - RECORDS BUREAU
YELLOW - DIRECTOR
GREEK - CAMPUS COMMAND
GOLD - CAPTAIN/SUPERVISOR
PINK - MEMBER

# Memo

5/8/04

Statement of incident on this date

Observer's Name: Maria Romero

Title: Mental Health clinician III

Observation:

This person observed Mr. Fanor sitting on a chair, with handcuff on. Police officer was in the process of frisking Mr. Fanor. Mr. Fanor was talking to the officer however, this observer could not hear what he was saying. The officer responded "are you threatening me?" Mr. Fanor responded again in a low tone of voice. Once again this observer could't hears Mr. Fanor's answer. Following this incident Mr. Fanor was moved to a patient's room and the officer closed the door behind him. Mr. Fanor and the officer could be observed talking however, you could't hear what they where saying.

Maria Romero, LSW

31

To Whom it may concern

On 05/08/07 while working in PES (C224)
the main door opened and I
heard inaudible word ~~while~~ between

a patient care ~~option~~ advocate and
a Newark Police Officer. The officer
then stated "your under arrest"
more inaudible words were
exchanged between the patient care advocate
+ the officer. I notified
C Purcell A.H.N. the patient, care
advocate was escorted out of
PES in custody of N.P.D

Respectfully submitted

RJ Rashed for RN

32

TO: Administration UMDNJ- Newark Campus

FROM: Charles Cohen - Mental Health Clinician II
      UBHC – PES

DATE: May 8, 2004

SUBJECT: Arrest of Evan Fanor in the PES Unit

At around 6:30 pm on the above date I witnessed the Newark Police Officer arresting Mr. Fanor. **He stood over Mr. Fanor speaking to him in an angry demeanor** he stated that was arresting Mr. Fanor for resisting arrest and made reference to two other charges. He handcuffed Mr. Fanor behind his back and sat him in a chair. He was later stood up and had his pockets emptied.  Mr. Fanor was questioning why he was being arrested in a high pitched voice. The arresting officer was shouting back that he was charged with resisting arrest. At no time did I hear the arresting officer read Mr. Fanor his Miranda rights.

FILL OUT COMPLETE REPORT WHEN LISTED IN CLASSIFICATION LIST AND REPORT GUIDE AS 802 (NO ASTERISK).
DO NOT FILL OUT SHADED PORTION WHEN LISTED 802 * (WITH ASTERISK).

| 1. VICTIM'S OR COMPLAINANT'S NAME | 2. TELEPHONE NO. | 17. STATUTE OF ORDINANCE | 18. SECTOR | 19. DISTRICT NO. | 20. CENT. COMPL. NO. |
|---|---|---|---|---|---|
| UNIT 316 ALVARADO & LIJO | 973.733.6190 | 2C:12-3 | 316 | EAST | 04-46436 |

| 3. RESIDENCE NUMBER (STREET) (FLOOR OR APT.) | 21. REPORTING OFFICER (NAME) | I.D. NO. | (COMMD) |
|---|---|---|---|
| 649 MARKET ST .NEWARK ,NJ | P.O. ALVARADO #9051 | | EAST DIST |

| 4. SEX | 5. RACE | 6. AGE | 7. OCCUPATION | 8. INJURY | 22. INCIDENT | 22A. OCCURRED ON PUBLIC HOUSING PROPERTY? |
|---|---|---|---|---|---|---|
| POLICE OFFICERS | | | | ☐ YES  ☐ NO | Terr. Threats | ☐ YES  ☒ NO |

| 9. SOBRIETY OF VICTIM | | 10. CAN VICT. IDENT. OFFENDER | 23. LOCATION |
|---|---|---|---|
| ☐ SOBER  ☐ HAD BEEN DRINKING  ☐ INTOX-ICATED | | ☒ YES  ☐ NO | 150 BERGEN ST. NEWARK,NJ |

| 11. PERSON REPORTING CRIME | 12. TELEPHONE NO. | 24. TIME OF OCCURRENCE (ON OR BET) | 25. WAS FORCE USED? |
|---|---|---|---|
| S A#1 | | HOUR: APPROX AT 1855 | ☒ YES  ☐ NO  ☐ NOT KNOWN |

| 13. RESIDENCE OF PERSON REPORTING CRIME | | DAY OF WEEK: SAT  MONTH: 05  DAY: 08  YEAR: 2004 | 26. WAS A WEAPON USED? |
|---|---|---|---|
| S A#3 | S A#2 | | ☐ YES  ☒ NO  ☐ NOT KNOWN |

| 14. TIME REPT | 15. MONTH | DAY | YEAR | 16. OCCURRED ON VIEW | 27. TYPE OF PREMISES OR PROPERTY ATTACKED |
|---|---|---|---|---|---|
| 1855 | 05 | 08 | 2004 | ☐ YES  ☒ NO | HOSPITAL |

| 28. HOW ATTACKED | 29. MEANS OF ATTACK |
|---|---|
| PHYSICAL FORCE | BY PERSON |

| 30. OBJECT OF ATTACK (IF VEHICLE ANTI-THEFT DEVICE INSTALLED) | 31. MODUS OPERANDI |
|---|---|
| DISORDERLY PERSON | ☐ Yes NA ☐ No  SEE NARATIVE |

| 32. VEHICLE INVOLVED IN CRIME | YEAR | MAKE | MODEL | LIC. NUMBER | STATE | COLOR | BODY TYPE | VEHICLE VIN NUMBERS |
|---|---|---|---|---|---|---|---|---|
| ☐ STOLEN  ☐ USED BY OFFENDER | | | | N / A | | | | |

| 33. NAME OF SUSPECT | (ALIAS) | (RESIDENCE) |
|---|---|---|
| EVANS FANOR (BLK#38) | | 156 IVY ST. NEWARK,NJ (SS#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) |

| SEX | RACE | AGE | HEIGHT | WEIGHT | COLOR OF HAIR | COLOR OF EYES | DESCRIBE CLOTHING WORN AND PECULIARITIES |
|---|---|---|---|---|---|---|---|
| M | BLK | 34 | 5'11 | 260 | bald | brown | BLK PANTS, BLK JACKET , BL SHIRT , BN SHOES |

| 34. ADDITIONAL INFORMATION (DO NOT REPEAT INFORMATION LISTED IN NUMBERED BLOCKS) | 34A. STRANGER TO STRANGER CRIME | 34B. OUTLAW LEN# |
|---|---|---|
| | ☒ Yes  ☐ No  ☐ Unknown | |

| 34C. REPORT SOURCE | 34D. VEHICLE INSURANCE COMPANY & POLICE NUMBER |
|---|---|
| ☐ 1 DISPATCH  ☐ 2 PHONE  ☐ 3 WALK-IN  ☒ 4 OTHER | PA |

event#193472 OFFICERS OF UNIT 316 ALVARADO & LIJO
WHILE ON A PRISONER WATCH TOOK A POLICE ACTION ON A
DISORDERLY PERSONS AT THE ABOVE LOCATION . THIS
UNDERSIGNED WHILE ON A PRISONER WATCH IN CRISIS
UNDER EVENT #193353 AS THE PRISONER WAS SEDATED THIS UNDERSIGNED WAS CONVERSING WITH THE
SUPERVISOR UNIT#303 E. BORGER OVER A PRIOR ASSIGNMENT WHILE IN ACCORDANCE WITH THE DIRECTOR'S
MEMORANDUM OUT OF THE PUBLIC'S VIEW AND ADMINISTERING DISCRETION THIS UNDERSIGNED WAS APPROACH
BY THE SUSPECT IN A HOSTILE THREATENING MANNER RAISING HIS HANDS AT THE OFFICERS FACE WITHIN
INCHES OF HIS FACE SCREAMING "HANG UP THE PHONE!" THIS SUSPECT WAS SO CLOSE TO THIS UNDERSIGNED
THAT HIS MOUTH'S SALVIA WAS REACHING THIS OFFICER'S FACE. THIS UNDERSIGNED INSTRUCTED THE SUSPE
TO REFRAIN FROM HIS ABUSIVE AND THREATENING BEHAVIOR.SUSPECT THEN CONTINUED BECOMING PHYSICALL
DANGEROUS AS HIS MANNERISM BECAME VIOLENT.THIS UNDERSIGNED ATTEMPTED TO INSTRUCT THE SUSPECT
THAT THE RN R. ROSHETER (NURSE IN CHARGE) GAVE THIS UNDERSIGNED PERMISSION TO USE HIS CELLULAR-

| 35. ESTIMATED VALUE BY TYPE OF PROPERTY | A. CURRENCY | B. JEWELRY | C. FURS | D. CLOTHING | E. LOCAL AUTO | F. MISCELLANEOUS | G. TOTAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | NA |

| 36. OTHER OFFICERS AT SCENE | (NAME) | VEH. NO. | COMMAND | (I.D. NO.) | 37. OTHER REPORTS SUBMITTED |
|---|---|---|---|---|---|
| RANK: O. ALBERTO LIJO | | 316 | EAST DISTRICT | 8052 | ☐ DP 1:152 PROPERTY ☐ DP 1:152-1 AUTO ☐ DP 1:225A STATEMENT ☐ DP 1:800 ARREST ☒ DP 1:795 CONT. |

| 38. PERSONS ARRESTED | (NAME) | CENT. ARR. NO. | 39. WITNESSES (NAME AND RESIDENCE) | (TELEPHONE NO.) |
|---|---|---|---|---|
| EVANS FANOR | | 12188 | SECURITY OFFICER E. HAYNES/150 BERGEN ST.NWK | |

RN ROBERT J. ROSHETER /150 BERGEN ST. NEWARK,NJ
MENTAL HEALTH MARIA ROMERO/150 BERGENST. NEWARK,NJ (TEL#973927-6134)

| 40. TELETYPE ALARM NUMBER | 41. NAME OR DETECTIVE NOTIFIED | 42. SIGNATURE OF REPORTING OFFICER |
|---|---|---|
| | | P.O. G. ALVARADO #9051 |

| 43. STATUS OF OFFENSE | | 44. CLEARED BY ARREST OF: (CHECK APPROPRIATE BOX OR BOXES) |
|---|---|---|
| ☐ UNFOUNDED  ☒ CLEARED BY ARREST  ☐ NOT CLEARED  ☐ EXCEPTIONAL CLEARANCE | | ☐ ADULT  ☐ JUVENILE  ☐ ADULT AND JUVENILE  ☐ NARCOTIC OFFENDER |

| 45. STATUS OF CASE | | 46. CLASS | 47. RE-CLASS | 48. KEY-PUNCHED BY: | 49. VERIFIED BY: |
|---|---|---|---|---|---|
| ☐ PENDING ACTIVE  ☐ PENDING INACTIVE  ☐ CLOSED | | 2690 | | | |

| 50. SUPERVISOR APPROVING & CLASSIFYING: | (DATE) | 51. TIME APPROVED | 52. INDEXED BY: | 53. NUMBER OF PAGES |
|---|---|---|---|---|
| | 5-8-04 | 2301 | | 1 / 2 |

P1: 802 REV. 5/94 - 75M

**POLICE DEPARTMENT** 34

**CONTINUATION REPORT**

**NEWARK, N.J.**

SPECIFIC OFFENSE

~~Terr~~ Threats.

STATUTE OR ORDINANCE (R.S. N.J.S REV ORD)

2C : 12-3

LOCATION OF OFFENSE

150 BERGEN ST. NEWARK.NJ

| DIST COMPLT NO | CENTRAL COMPLAINT NO |
|---|---|
| 610116 | 04-46436 |
| DATE OF OCCURRENCE | |
| 05/08/04 | |

EVENT#193472 WITHIN THE CRISIS HOLDING AREA RM#C-224A WHICH HAS CONTROL ACCESS AND IS RESTRICTED TO THE PUBLIC. SUSPECT CONTINUED HIS VIOLENT BEHAVIOR AT THE UNDERSIGNED AS HE WAS INSTRUCTED REPEATEDLY TO REFRAIN. THIS SUSPECT SCREAMED REATEDLY AT THE UNDERSIGNED "YOU DONT KNOW WHO HELL I AM !"I TOLD YOU GET OFF THE PHONE!" AT THIS POINT THIS UNDERSIGNED ATTEMPTED TO PLACED THE SUSPECT INTO POLICE ARREST AS BEGAN TO FLAIR HIS ARMS AT THIS UNDERSIGNED AND PARTNER . SUSPECT ATTEMPTED TO PUSH OFFICERS TO PREVENT A LAWFULL ARREST AS A COMPLIANCE HOLD TO THE SUSPECT ARMS EFFECTED THE ARREST WITHOUT FURTHER INCIDENT.IT SHOULD FURTHER BE MENTIONED THAT DURING THE PRISONER'S RESTANCE HE HAD STATED " YOU WAIT AND SEE WHAT WILL HAPPEN TO YOU AND YOUR FAMILY!" PRISONER WAS PLACED INTO A SECURED ROOM WHERE HE CONTINUED TO BE VERBALLY ABUSIVE TO THE UNDERSIGNED IN VIEW OF THE HOSPITAL (WITNESSES) SUSPECT CONTINUED TO STATE "I WILL FUCKING KILL YOU MOTHER FUCKER, YOU'LL SEE !" YOU DONT KNOW WHO THE FAUCK I AM!" PRISONER WAS TRANSPORTED TO THE EAST FOR PROCESSING IN THE HOLDING CELL AND DURING PROCESSING THE PRISONER CONTINUED HIS THREATS AND WITH HIS LEFT HAD MADE AS IF HE WAS SHOOTING A HAND GUN AT THIS UNDERSIGNED . IT SHOULD FURTHER BE MENTIONED THAT  THIS PRISONER JOB TITLE IS PATIENT ADVOCATE WHO RESPONSIBILIT IS TO FRONT ENTRANCE SOLEY AND AS· PER THE DUTY RN R. ROSHETER HE HAD NO REASON FOR BEING IN THE SECURED CRISIS ROOM. IT SHOULD ALSO BE FURTHER MENTIONED THAT THE SECURITY GUARD (WITNESS) ALSO INSTRUCTED THE SUSPECT TO COMPLY AND REFRAIN FROM HIS INTIMIDATING VIOLENT BEHAVIOR ASWELL AS HIS VERBAL THREATS. THIS UNDERSIGNED OBTAINED A USE OF FORCE #191 FOR THE COMPLAINCE HOLD UTILIZED TO EFFECT THE ARREST.

| AMENDED PROPERTY VALUATION | A CURRENCY | B JEWELRY | C FURS | D CLOTHING | E LOCAL AUTO | F MISCELLANEOUS | G TOTALS |
|---|---|---|---|---|---|---|---|
| | | | | | | | M/A |

RANK

SIGNATURE OF OFFICER SUBMITTING REPORT

COMMAND EAST

BADGE NUMBER 9051

STATUS OF OFFENSE

☐ UNFOUNDED   ☑ CLEARED BY ARREST   ☐ NOT CLEARED   ☑ EXCEPTIONALLY CLEARED

STATUS OF CASE: ☐ PENDING ACTIVE   ☐ PENDING INACTIVE   ☑ CLOSED

CLEARED BY ARREST OF

☐ JUV   ☑ ADULT   ☐ JUV & ADULT   ☐ NARCOTIC OFFENDER

CLASSIFICATION 2690

RECLASSIFICATION

READ CLASSIFIED AND APPROVED BY

LIEUT.

DATE 5-8-04

TALLIED BY

INDEXED BY

FILED BY

PAGE NUMBER

NO. OF PAGES 2 of 2

DPI-795 60M 8/93

RECORD BUREAU COPY

# POLICE DEPARTMENT — ARREST RECORD — NEWARK, N.J.

| 1. PRISONER'S LAST NAME | FIRST | MIDDLE | 2. TIME AND DATE OF ARREST | 3. SECTOR | 4. COMMAND | 5. DIST. COURT NO. | 6. ARREST NO. |
|---|---|---|---|---|---|---|---|
| FANOR | EVENS | | 1901  05-08-04 | E | G-10416 | 12188 | A-2 |

| 7. PRISONER'S ADDRESS | 8. FLR. | 9. APT. | 10. ALIASES: (OR MAIDEN NAME IF FEMALE) | 11. OTHER AGENCY # | 12. CENT. COMPLT. NO |
|---|---|---|---|---|---|
| 156 IVY STREET    NEWARK, N.J | | | | 1347 | 46436-04 |

| 13. WHERE ARRESTED | 14. DATE OF BIRTH | 15. PLACE OF BIRTH | 16. AGE | 17. HEIGHT | 18. WEIGHT | 19. HAIR | 20. EYES | 21. COMPLEXION |
|---|---|---|---|---|---|---|---|---|
| 150 BERGEN STREET | 01-30-70 | BROOKLYN  N.Y | 34 | 5'11 | 254 | BK | BK | DARK |

| 22. RACE | 23. SEX | 24. HISPANIC / NON HISPANIC | 25. MARRIED / SINGLE | 26. CLOTHING | | 27. CDR # 1 or CITY ORDINANCE |
|---|---|---|---|---|---|---|
| BK | M | NON HISPANIC | SINGLE | BK PANTS, BK JACKET, BU SHOES, BL SHIRT | | SUM # - S.  SUM # - S. |

| 28. SOC. SEC. NUMBER | 29. DRIVERS LICENSE NO | 30. STATE | 31. VEH. REG. NO. | 32. SCHOOL AND GRADE OF JUVENILE | 33. CDR #2 |
|---|---|---|---|---|---|
| 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 | NONE | — | — | NONE | WAR # - W.  04-014522  WAR # - W. |

| 34. OCCUPATION | 35. NAME OF EMPLOYER OR GOVERNMENT AGENCY | 36. SCARS, MARKS AND OTHER DESCRIPTIVE DATA |
|---|---|---|
| PATIENT ADVOCACY | UMDNJ | NONE |

| 37. SPECIFIC OFFENSE: | STATE OR ORD. NO. | CLASS | JUDGE | COURT DOCKET NO. | DISPOSITION | DATE OF DISPO | FINAL CHARGE |
|---|---|---|---|---|---|---|---|
| TERRORISTIC THREATS | 2C:12-3 | 2690 | | | | | |
| I. | | | | | | | |
| II. | | | | | | | |
| V. | | | | | | | |
| √ | | | | | | | |

| 38. TIME AND DATE OF OCCURRENCE | 39. TYPE OF PREMISES | 40. PLACE OF OCCURRENCE | 41. OCCURRED ON PUBLIC HOUSING PROPERTY? |
|---|---|---|---|
| 1901  05-08-04 | HOSPITAL | 150 BERGEN STREET | ☐ YES  ☒ NO |

| 42. VICTIM OR COMPLAINANT'S NAME | 43. VICTIM OR COMPLAINANT'S ADDRESS | 44. COMPLTS. TEL. NO'S: HOME & BUSINESS |
|---|---|---|
| UNIT 316 (C.ALVARADO/A.LIJO) | 649 MARKET STREET | (973)   733  /  6190 |

**45. DETAILS OF ARREST:**

EVENT # 193472   THE ABOVE INDIVIDUAL WAS ARRESTED FOR TERRORISTIC THREATS AFTER HE STATED TO P/O C. ALVARADO "I'M GOING TO FUCKING KILL YOU AND YOUR FAMILY MOTHER FUCKER!" AND MAKING A HAND GESTURES AS SHOOTING A HAND GUN AT THE ARREST OFFICER.

46. STRANGER TO STRANGER CRIME  ☒ YES  ☐ NO  ☐ UNKNOWN

PRISONER PROPERTY BAG #M331857
PRISONER REFUSED PHONE CALL AT 2010 HOURS

| 47. CHECK REPORTS SUB. | |
|---|---|
| DP 1:802 | XX |
| DP 1:795 | XX |
| NJTR-1 | |
| NP 1:1001 | |
| DP 1:1517 | |
| DP 1:152 | |
| DP 1:152:1 | |
| DP 1:225A | |
| CDR | XX |
| 1755 | XX |

| 48. OTHER PERSON ARRESTED (NAME) | 49. CENT. ARREST NO | 50. OTHER PERSON ARRESTED (NAME) | 51. CENT. ARREST NO |
|---|---|---|---|
| NONE | | NONE | |

| 52. ARRESTED | 53. RESULTS OF RECORD CHECK | 54. IS PRISONER WANTED? | 55. IF WANTED, BY WHOM? | 56. WHO WAS NOTIFIED? | 57. DET. NOTIFIED | 58. PARENTS OF JUV. NOTIFIED BY: | 59. INTAKE OFFICER |
|---|---|---|---|---|---|---|---|
| 9474 | ☐ RECORD  ☒ NO RECORD | NO | | | | | |

| 60. JUV. RELEASED TO / RELATIONSHIP | 61. ADDRESS PERSON RELEASED TO | 62. HOME TELEPHONE NUMBER | 63. BUSINESS TELEPHONE | 64. JUVENILE DETAINED AT: |
|---|---|---|---|---|
| | | | | |

| 65. PRISONER TO BE FINGERPRINTED: | 66. PRISONER TO BE PHOTOGRAPHED: | 67. PRISONER SEARCHED BY: | 68. MONEY IN PRISONER'S POSSESSION | 69. RESTRICTIONS | 70. RESERVED |
|---|---|---|---|---|---|
| ☒ YES  ☐ NO | ☒ YES  ☐ NO | P/O A.LIJO | $56.25 | ☐ YES  ☐ NO | |

| 71. SIGNATURE OF ARRESTING OFFICER | /COMMAND | / I.D. NO. | / TOUR OF DUTY | 72. READ, CLASSIFIED AND APPROVED BY |
|---|---|---|---|---|
| C.ALVARADO/A.LIJO | EAST | 9051/8052 | 1500-2300 | LIEUT. |

| 73. INVESTIGATION ASSIGNED TO: | 74. INVESTIGATION COMPLETED | (SIGNATURE OF INVESTIGATOR) | 75. ARRAIGNMENT (DATE) | 76. COURT | 77. AMOUNT OF BAIL | 78. BAIL SET OR PAROLED BY: |
|---|---|---|---|---|---|---|
| | | | | | | |

| 79. SIGNATURE OF PERSON PAROLED TO | 80. LIEUTENANT ACCEPTING BAIL: OR PAROLING PRISONER | 81. COMMITTED IN DEFAULT OF BAIL  ☐ YES  ☐ NO | COMMITTED WITHOUT BAIL  ☐ YES  ☐ NO | DIRECTLY TO ARRAIGNMENT  ☐ YES  ☐ NO |
|---|---|---|---|---|
| | | | | |

| 82. OFFICER IN CHARGE OF PRISONER | 83. SENT TO CELL BLOCK BY | 84. RECEIVED AT CELL BLOCK BY: | 85. TIME & DATE REC | 86. CELL NO. |
|---|---|---|---|---|
| | LT. TORRES. | | 00405-9-04 | 5 |

| 87. TIME AND DATE TO COURT: | OFFICER | 88. POSTPONED TO |
|---|---|---|
| | | |

| 89. TIME AND DATE FROM COURT: | OFFICER | 90. PREVIOUS ARRESTS FOR BAIL DETERMINATION |
|---|---|---|
| | | |

| 91. TIME AND DATE OF JAIL: | OFFICER | 92. RESERVED | 93. F.P. NO. |
|---|---|---|---|
| | | | GAL. NO. |

| 94. INDEXED BY: | 95. MICRO PROCESSED BY: | 96. RESERVED | 97. FINGERPRINTED BY | PHOTOGRAPHED BY | 98. S.B. NO. |
|---|---|---|---|---|---|
| | | | | | 216211 D |

HP1.800 REV.1-94

TO BE FORWARDED TO THE MUNICIPAL COURT WHEN THE DISPOSITION IS COMPLETED TO BE FORWARDED TO THE R AND I BUREAU

RECORD & IDENTIFICATION BUREAU WORK COPY

# POLICE DEPARTMENT — ARREST REPORT — NEWARK, N.J.

| 1. PRISONER'S NAME | | | | 3. TIME AND DATE OF ARREST | 4. SECTOR/POST/CONT. | 5. DIST. ARREST NO. | 6. CENT. ARREST NO. |
|---|---|---|---|---|---|---|---|
| FAHOR | EVENT | | | 1901 05-08-04 | 1347 | 610116 | 12188 B-2 |

| 7. PRISONER'S ADDRESS | | 8. FLR. | 9. APT. | 10. ALIASES (OR MAIDEN NAME IF FEMALE) | 11. OTHER AGENCY | 12. CENT. COMPLT. NO. |
|---|---|---|---|---|---|---|
| 156 IVY STREET | NEWARK, N.J. | | | | 1347 | 46436-04 |

| 13. WHERE ARRESTED | 14. DATE OF BIRTH | 15. PLACE OF BIRTH | | 16. AGE | 17. HEIGHT | 18. WEIGHT | 19. HAIR | 20. EYES | 21. COMPLEXION |
|---|---|---|---|---|---|---|---|---|---|
| 150 BERGEN STREET | 03-30-70 | BROOKLYN | N.Y | 34 | 5'11 | 254 | BK | BK | DARK |

| 22. RACE | 23. SEX | 24. IS HISPANIC | 25. IS MARRIED | 26. CLOTHING | | 27. CDR #1 or CITY ORDINANCE |
|---|---|---|---|---|---|---|
| BK | M | X NON HISPANIC | X SINGLE | BK PANTS, BK JACKET, BU SHOES, BL SHIRT | | SUM # S 014747 SUM # S |

| 28. SOC. SEC NUMBER | 29. DRIVERS LICENSE NO | 30. STATE | 31. VEH REG NO | 32. SCHOOL, AND GRADE OF JUVENILE | 33. CDR #2 |
|---|---|---|---|---|---|
| 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 | NONE | | | NONE | WAR # - W. |

| 34. OCCUPATION | 35. NAME OF EMPLOYER OR GOVERNMENT AGENCY | 36. SCARS, MARKS AND OTHER DESCRIPTIVE DATA | WAR # - W. |
|---|---|---|---|
| ADVOCACY | GOV'T | NONE | |

| 37. STRUCTURE OF ADMIN | STATE OR ORD NO | CLASS | JUDGE | COURT DOCKET NO | DISPOSITION | DATE OF DISPO | FINAL CHARGE |
|---|---|---|---|---|---|---|---|
| OF LAW | 2C:29-1B | 2700 | | | | | |
| RESISTING ARREST | 2C:29-2 | 2300 | | | | | |
| DISORDERLY CONDUCT | 2C:33-2(A) | 2410 | | | | | |
| N | | | | | | | |
| V | | | | | | | |

| 38. TIME AND DATE OF OCCURRENCE | 39. TYPE OF PREMISES | 40. PLACE OF OCCURRENCE | 41. OCCURRED ON PUBLIC HOUSING PROPERTY? |
|---|---|---|---|
| 1901 05-08-04 | HOSPITAL | 150 BERGEN STREET | ☐ YES ☒ NO |

| 42. VICTIM OR COMPLAINANT'S NAME | 43. VICTIM OR COMPLAINANT'S ADDRESS | 44. COMPLTS. TEL. NO'S: HOME & BUSINESS |
|---|---|---|
| UNIT 316 (C.ALVARADO/A.LIJO) | 649 MARKET STREET | (973) 733 / 6190 |

**45. DETAILS OF ARREST:**

EVENT # 193472   THE ABOVE INDIVIDUAL WAS ARRESTED FOR OBSTRUCTION OF OF ADMINISTRATION OF LAW BY POINTING HIS FINGERS AND HANDS AT OFFICER
THE ABOVE INDIVIDUAL WAS ARRESTED FOR RESISTING ARREST BY FLAIRING HIS HANDS AND PUSHING OFFICERS AWAY TO PREVENT ARREST
THE ABOVE INDIVIDUAL WAS ARRESTED FOR DISORDERLY CONDUCT BY ENGAGING AND CREATING A RISE OF VIOLENT BEHAVIOR AND PLACING HIS HAND ON OFFICER

PRISONER PROPERTY BAG #G331857
PRISONER REFUSED PHONE CALL AT 2010 HOURS

| 46. STRANGER TO STRANGER CRIME | 47. CHECK REPORTS SUB. |
|---|---|
| ☐ YES ☐ NO ☐ UNKNOWN | |

| | | |
|---|---|---|
| XX | DP 1:602 | |
| XX | DP 1:795 | |
| | NJTR-1 | |
| | NP 1:1001 | |
| | DP 1:1517 | |
| | DP 1:152 | |
| | DP 1:152.1 | |
| | DP 1:225A | |
| XX | CDR | |
| XX | 1755 | |

| 48. OTHER PERSON ARRESTED (NAME) | 49. CENT. ARREST NO | 50. OTHER PERSON ARRESTED (NAME) | 51. CENT. ARREST NO. |
|---|---|---|---|
| NONE | | NONE | |

| 52. RECORD NO | 53. RESULTS OF RECORD CHECK | 54. IS PRISONER WANTED? | 55. IF WANTED, BY WHOM? | 56. WHO WAS NOTIFIED? | 57. DET NOTIFIED | 58. PARENTS OF JUV. NOTIFIED BY: | 59. INTAKE OFFICER |
|---|---|---|---|---|---|---|---|
| 9474 | ☐ RECORD ☐ NO RECORD | NO | | | | | |

| 60. JUV. RELEASED TO / RELATIONSHIP | 61. ADDRESS PERSON RELEASED TO | 62. HOME TELEPHONE NUMBER | 63. BUSINESS TELEPHONE | 64. JUVENILE DETAINED AT: |
|---|---|---|---|---|
| | | | | |

| 65. PRISONER TO BE FINGERPRINTED? | 66. PRISONER TO BE PHOTOGRAPHED? | 67. PRISONER SEARCHED BY: | 68. MONEY IN PRISONER'S POSSESSION | 69. RESTRICTIONS | 70. RESERVED |
|---|---|---|---|---|---|
| X YES ☐ NO | X YES ☐ NO | P/O A.LIJO | $56.25 | ☐ YES ☐ NO | |

| 71. SIGNATURE OF ARRESTING OFFICER | /COMMAND | / I.D. NO. / TOUR OF DUTY | 72. READ, CLASSIFIED AND APPROVED BY |
|---|---|---|---|
| C. ALVARADO/A.LIJO | EAST 9051/8052 | 1500-2300 | LIEUT. |

| 73. INVESTIGATION ASSIGNED TO: | 74. INVESTIGATION COMPLETED | (SIGNATURE OF INVESTIGATOR) | 75. ARRAIGNMENT (DATE) | 76. COURT | 77. AMOUNT OF BAIL | 78. BAIL SET OR PAROLED BY: |
|---|---|---|---|---|---|---|
| | | | | | | |

| 79. SIGNATURE OF PERSON PAROLED TO | 80. LIEUTENANT ACCEPTING BAIL OR PAROLING PRISONER | 81. COMMITTED IN DEFAULT OF BAIL | COMMITTED WITHOUT BAIL | DIRECTLY TO ARRAIGNMENT |
|---|---|---|---|---|
| | | ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

| 82. OFFICER IN CHARGE OF PRISONER | 83. SENT TO CELL BLOCK BY | 84. RECEIVED AT CELL BLOCK BY: | 85. TIME & DATE REC. | 86. CELL NO. |
|---|---|---|---|---|
| | CT-TORRES | | 0040 5-9-04 | |

| 87. TIME AND DATE TO COURT: | OFFICER | 88. POSTPONED TO |
|---|---|---|
| | | / |

| 89. TIME AND DATE FROM COURT: | OFFICER | 90. PREVIOUS ARRESTS FOR BAIL DETERMINATION |
|---|---|---|
| | | |

| 91. TIME AND DATE OF JAIL: | OFFICER | 92. RESERVED | 93. F.P. NO. |
|---|---|---|---|
| | | | GAL. NO. |

| 94. INDEXED BY: | 95. MICRO PROCESSED BY | 96. RESERVED | 97. FINGERPRINTED BY | PHOTOGRAPHED BY | 98. S.B. NO. | F.B.I NO. 716216 D |
|---|---|---|---|---|---|---|
| | | | | | | |

DPR:800 REV. 1-94

TO BE FORWARDED TO THE MUNICIPAL COURT: WHEN THE DISPOSITION IS COMPLETED TO BE FORWARDED TO THE R AND I BUREAU.

| 1. PRISONER'S LAST NAME | | 2. FIRST NAME | | 3. M.I. | 4. COMMAND & DISTRICT | 5. CENT. ARREST NO. |
|---|---|---|---|---|---|---|
| **FANOR** | | **EVENS** | 1901  05-08-04 | E | 610446 | 12188 B-? |

7. PRISONER'S ADDRESS:
**156 IVY STREET        NEWARK, N.J**

| 8. FLR. | 9. APT. | 10. ALIASES: (OR MAIDEN NAME IF FEMALE) | 11. OTHER AGENCY # | 12. CENT. COMPLT. NO. |
|---|---|---|---|---|
| | | | | **46436-04** |

| 13. WHERE ARRESTED: **150 BERGEN STREET** | 14. DATE OF BIRTH **01-30-70** | 15. PLACE OF BIRTH **BROOKLYN    N.Y** | 16. AGE **34** | 17. HEIGHT **5'11** | 18. WEIGHT **254** | 19. HAIR **BK** | 20. EYES **BK** | 21. COMPLEXION **DARK** |
|---|---|---|---|---|---|---|---|---|

| 22. RACE **BK** | 23. SEX **M** | 24. ☐ HISPANIC   ☒ NON HISPANIC | 25. ☐ MARRIED   ☒ SINGLE | 26. CLOTHING **BK PANTS, BK JACKET, BU SHOES, BL SHIRT** | 27. CDR # 1 or CITY ORDINANCE |
|---|---|---|---|---|---|

SUM – S. **014747**
SUM – S.

| 28. SOC. SEC. NUMBER **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** | 29. DRIVERS LICENSE NO **NONE** | 30. STATE | 31. VEH. REG. NO. | 32. SCHOOL AND GRADE OF JUVENILE **NONE** | 33. CDR #2 |
|---|---|---|---|---|---|

WAR # – W.
WAR # – W.

| 34. OCCUPATION **ADVOCACY** | 35. NAME OF EMPLOYER OR GOVERNMENT AGENCY **UMDNJ** | 36. SCARS, MARKS AND OTHER DESCRIPTIVE DATA **NONE** |
|---|---|---|

| | STATE OR ORD. NO. | CLASS | JUDGE | COURT DOCKET NO. | DISPOSITION | | DATE OF DISPO | FINAL CHARGE |
|---|---|---|---|---|---|---|---|---|
| I. **OBSTRUCTION OF ADMIN. OF LAW** | **2C:29-1B** | 2700 | | | | | | |
| II. **RESISTING ARREST** | **2C:29-2** | 2200 | | | | | | |
| III. **DISORDERLY CONDUCT** | **2C:33-2(A)** | 2410 | | | | | | |
| IV. | | | | | | | | |
| V. | | | | | | | | |

| 38. TIME AND DATE OF OCCURRENCE: **1901    05-08-04** | 39. TYPE OF PREMISES **HOSPITAL** | 40. PLACE OF OCCURRENCE: **150 BERGEN STREET** | 41. OCCURRED ON PUBLIC HOUSING PROPERTY? ☐ YES ☒ NO |
|---|---|---|---|

| 42. VICTIM OR COMPLAINANT'S NAME: **UNIT 316 (C.ALVARADO/A.LLJO)** | 43. VICTIM OR COMPLAINANT'S ADDRESS **649 MARKET STREET** | 44. COMPLTS. TEL. NO'S.: HOME & BUSINESS **(973)    733    6190** |
|---|---|---|

45. DETAILS OF ARREST:
**EVENT # 193472    THE ABOVE INDIVIDUAL WAS ARRESTED FOR OBSTRUCTION
OF OF ADMINISTRATION OF LAW BY POINTING HIS FINGERS AND HANDS AT OFFICER
    THE ABOVE INDIVIDUAL WAS ARRESTED FOR RESISTING ARREST BY FLAIRING
HIS HANDS AND PUSHING OFFICERS AWAY TO PREVENT ARREST
    THE ABOVE INDIVIDUAL WAS ARRESTED FOR DISORDERLY CONDUCT BY ENGAGING
AND CREATING A RISK OF VIOLENT BEHAVIOR AND PLACING HIS HAND ON OFFICER**

**PRISONER PROPERTY BAG #M331857**
**PRISONER REFUSED PHONE CALL AT 2010 HOURS**

| 46. STRANGER TO STRANGER CRIME ☒ YES ☐ NO ☐ UNKNOWN | 47. CHECK REPORTS SUB. |
|---|---|

| XX | DP 1:802 |
|---|---|
| XX | DP 1:795 |
| | NJTR-1 |
| | NP 1:1001 |
| | DP 1:1517 |
| | DP 1:152 |
| | DP 1:152:1 |
| | DP 1:225A |
| XX | CDR 1755 |

| 48. OTHER PERSON ARRESTED (NAME) **NONE** | 49. CENT. ARREST NO. | 50. OTHER PERSON ARRESTED (NAME) **NONE** | 51. CENT. ARREST NO. |
|---|---|---|---|

| 52. MARSHALL **9474** | 53. RESULTS OF RECORD CHECK: ☐ RECORD ☐ NO RECORD | 54. IS PRISONER WANTED? **NO** | 55. IF WANTED, BY WHOM? | 56. WHO WAS NOTIFIED? | 57. DET NOTIFIED | 58. PARENTS OF JUV. NOTIFIED BY. | 59. INTAKE OFFICER |
|---|---|---|---|---|---|---|---|

| 60. JUV. RELEASED TO / RELATIONSHIP | 61. ADDRESS PERSON RELEASED TO | 62. HOME TELEPHONE NUMBER | 63. BUSINESS TELEPHONE | 64. JUVENILE DETAINED AT. |
|---|---|---|---|---|

| 65. PRISONER TO BE FINGERPRINTED: ☒ YES ☐ NO | 66. PRISONER TO BE PHOTOGRAPHED: ☒ YES ☐ NO | 67. PRISONER SEARCHED BY: **P/O A.LLJO** | 68. MONEY IN PRISONER'S POSSESSION **$56.25** | 69. RESTRICTIONS | 70. RESERVED |
|---|---|---|---|---|---|

| 71. SIGNATURE OF ARRESTING OFFICER **C.ALVARADO/A.LLJO** /COMMAND **EAST** / I.D. NO. **9051/8052** / TOUR OF DUTY **1500-2300** | 72. READ, CLASSIFIED AND APPROVED BY LIEUT. |
|---|---|

| 73. INVESTIGATION ASSIGNED TO: | 74. INVESTIGATION COMPLETED (SIGNATURE OF INVESTIGATOR) | 75. ARRAIGNMENT (DATE) | 76. COURT | 77. AMOUNT OF BAIL | 78. BAIL SET OR PAROLED BY: |
|---|---|---|---|---|---|

| 79. SIGNATURE OF PERSON PAROLED TO: | 80. LIEUTENANT ACCEPTING BAIL OR PAROLING PRISONER | 81. COMMITTED IN DEFAULT OF BAIL ☐ YES ☐ NO | COMMITTED WITHOUT BAIL ☐ YES ☐ NO | DIRECTLY TO ARRAIGNMENT ☐ YES ☐ NO |
|---|---|---|---|---|

| 82. OFFICER IN CHARGE OF PRISONER | 83. SENT TO CELL BLOCK BY: **LT. TORRES.** | 84. RECEIVED AT CELL BLOCK BY: | 85. TIME & DATE REC. **0040 5-9-04** | 86. CELL NO. |
|---|---|---|---|---|

| 87. TIME AND DATE TO COURT. | OFFICER | 88. POSTPONED TO |
|---|---|---|

| 89. TIME AND DATE FROM COURT. | OFFICER | 90. PREVIOUS ARRESTS FOR BAIL DETERMINATION |
|---|---|---|

| 91. TIME AND DATE OF JAIL. | OFFICER | 92. RESERVED | 93. F.P. NO. |
|---|---|---|---|

| 94. INDEXED BY: | 95. MICRO PROCESSED BY | 96. RESERVED | 97. FINGERPRINTED BY | PHOTOGRAPHED BY: | 98. GAL. NO.   S.B. NO. **216216D**   F.B.I NO. |
|---|---|---|---|---|---|

XP1:800 REV.1-94

TO BE FORWARDED TO THE MUNICIPAL COURT; WHEN THE DISPOSITION
IS COMPLETED IT IS TO BE FORWARDED TO THE R AND I BUREAU.

RECORD & IDENTIFICATION BUREAU WORK COPY

# FUNCTIONAL JOB DESCRIPTION

### TITLE CODE: 00347B

## PATIENT REPRESENTATIVE

Under the direction of the Associate Director, serves as representative of hospital administration and provides a centralized mechanism for patients, families and visitors to achieve a satisfactory resolution of problems; focuses on potential problem areas to minimize the risk of health hazards to patients and the hospital and potential liability and consequent litigation.  Educate both staff, patients, families and visitors as to the Patient's Rights and Responsibilities.   Ensure that patients are granted due process, and that the institution can realize maximum financial compensation.  Humanize patient's hospital experience by interpreting and clarifying hospital policies, procedures, philosophy and routines to patient for better understanding.

## MAJOR DUTIES:

1. **Investigates and resolves patient complaints throughout the entire hospital complex: In-patients, Outpatients, and Emergency Room patients.**

2. Distributes Patient's Bill of Rights and Responsibilities to all patients in the institution.

3. Educates patients, families, visitors and staff into the Patient's Rights and Responsibilities.

4. Explains the Patient representative Program.

5. Interprets policies and procedures to patients, families and visitors. Review, and update, compile and extract obsolete copies of policies.

6. Analyzes and interpret data to determine appropriate action and refers to cognizant resource person and/or agency for resolution.

7. Documents all complaints, requests and compliments concerning the institution, its staff and services.

8. Generates Summary reports, Interdepartmental memos and departmental memos outlining problems and requesting responses where necessary.

9. Generating weekly and monthly reports and narratives indicating Quality Improvements.

10. Makes recommendations initiate corrective action to systemic problems, this is based on trending of information.

11. Sets-up conferences for patients, families and significant other.

12. Assisting patients with (a) lost property (b) proper discharge information (Social Services) © Clothing.

13. Intervenes on the patient's behalf in billing problems to ensure that appropriate billing systems have applied and takes corrective action needed through finance.

14. Escorts patients as necessary to various areas through the institution.

15. Acts as the liaison in the Emergency Room, representing both the patient and administration in maintaining two-way communication.

16. Helps alleviate unnecessary requests by families and visitors in the emergency Room areas.

17. Provides access to interpreter when language barriers is a problem in communication with patient, families or visitors.

18. Arranges for new clinical appointment and secure patient's medical records in the event that records were not available on the last visit.

19. Tracks down tests and reports for patients in the clinics, when ever it is missing.

19. Investigates and issue special passes to patients relatives when necessary.

20. Responds to patients, families and agencies requests for responses to their complaints.

21. Gives general educational information that affects the patient in the institution (ie) Proxy Law.

22. Generates reports as part of the Quality Management Division of the institution.

## A JOYOUS CELEBRATION
### OF LIFE FOR A JOB WELL DONE
#### "MAY THE WORK I HAVE DONE, SPEAK FOR ME"

Processional

Opening Remarks................Rev. Nigel Hundy

Selection................Amazing Grace #206

Prayer................Minister Raymond Carvil

Scripture................Charlot Alexandre

Selection................Officer Julius Nelson
Officer Angela Chin

Remarks

Reflections of Yves Phanor...(Limited two minutes please)
Gary Eugene
Alix Saintil
Representative of the Police Department

Acknowledgements/
Presentations........Pax-Villa Florida Funeral Home Staff

Obituary................Read silently to soft music

Solo................Julene Smith

Ministry of the Word................Pastor Nigel Hundy

Prayer

Parting View

Recessional



## TRIBUTE

It's so hard for me to let go of you,
And convince myself you're in a better place,
Knowing this will be my last chance
To see that great big smile on your face.

I'm happy that God's taking care of you,
But the fact that you're gone is tearing me apart,
Because I miss you, my dearest Husband
With every single beat of my heart.

I need God to give me the strength to realize
That now I love you from a distance.
But I'm so glad that you're with God,
Because you deserve nothing but the best.

I truly wish I can understand
Why you had to leave,
And my as strong as I try to be,
All I can do is grieve.

Since this is my final farewell to you,
I have only one thing left to say,
I love you my dear, sweet, sweet, Yves
And your precious memories will carry me through each day.

From your faithful and
Loving wife

## OBITUARY

Yves Phanor was born to the proud parents of Ulrick Phanor and Anne Marie Dantes Robert on July 18, 1958 in Haiti.

He is survived by: his wife, Marie Chantal Phanor; his children, Ashley Phanor, Jessica Phanor, Ryan Phanor, Mark Phanor; his mother, Anne Marie Robert; his step mother, Gerda Phanor; his step father, Gabriel Robert; his sisters, Marjorie Phanor, Mirianne Phanor, Marie Elise Rüchez, Marie Michelle Dantes; his brothers, Frantz Phanor, Evans Phanor, Wilfrid Phanor, Joseph Yvon Dantes; his uncles, Rudolph Phanor, Joseph Phanor, Blucher Louis, Gerard Dantes, Leon Dantes; his aunts, Solange Phanor, Immacula Louis, Paulette Noel, Giselle Phanor, Marie Ange Phanor, Yvanne Jean, Clarence Dantes, Marguerite Jeudy; his mother-in-law, Solange Saintil; his sisters-in-law, Maggy Saintil, Christian and Marjorie Saintil, Noris Saintil, Betty Saintil, Jacqueline Saintil, Connie Saintil, Marie Rose Dantes; his brothers-in-law, Alix Saintil, Patrick Saintil, Gary Saintil, Reginald Saintil, Romuel Rüchez; his nieces, Romy Ritchez, Sheena Christian, Natasha Christian, Dominique Saintil, Crystal Saintil, Katrina Saintil, Armani Saintil, Priscilla Alvarez; his nephews, Dave Ritchez, Spencer Paul Dantes, Alix Saintil Jr., Patrick Saintil Jr., Reginald Saintil Jr., Delino Saintil, Kyle Saintil, William Alvarez; cousins, Phanor, Dantes, Jeudy, Jean, Sajous, Louis, Lemaire, Hyppolite, Pierre, Dupervil, Joseph; and his friends, Lt. Barry Eugene, Lt. T.C. Cowart, Det. Raymond Carvil, Det. Leslie Dallemand, Major Marc Elias, Det. Julius Nelson, Guy Russeau, Dr. Gregoire Eugene, Det. Franzia Brea, Det. Frantz Gilles, Arisbene Ludovic, Roger Lanoue, Robert Lazaitte, Bernard Cassagnol, Adrien Rameau, Fred Jean Jean St. Amand, Officier Marilyn Pean, the Beauzile Families.

State Services - As an Officer of the City of Miami Police Department July 1989.

National Services - Instructor of the Haitian New Police Task Force April 1995.

Community and City Services - Was a great supporter of many organization of the community in the State of Florida, and also Port-Au-Prince Haiti.

Demise : August 28, 1996



# CELEBRATION OF LIFE
## FOR THE LATE

# OFFICER YVES PHANOR

Saturday, September 7, 1996
10:00 A.M.

at

Evangel Temple
590 N.W. 159th Street
Miami, Florida
Officiating  Pastor Nigel Hundy

Pax Villa Funeral Home

---

## HONORARY PALLBEARERS

| | |
|---|---|
| Garry Eugene | Leslie Dallemand |
| Marc Elias | Julius Nelson |
| Tonsam Cowart | Raymond Carvil |

### SPECIAL VOTE OF THANKS

During one's lifetime, we meet and become closely associated with many people. True friendship is the result of these lasting relationship. Yve's became attached to many people very special friends include Fred "Jean Jean" St. Amand, Garry Eugene, Marc Elias, Marc Paul, Tonsom Cowart, Leslie Dallemand, Julius Nelson, Raymond Carvil, the entire Royal Police Department of the City of Miami, just to mention a few, but most of all my wife Chantal and our children. God was always the head of the family and followed his divine calling. No matter what! God is still in control

Love Always
"Yves Phanor"

### ACKNOWLEGMENT

The Family of the late Officer Yves Phanor extends deep appreciation to our many friends, neighbors, and Yves co-workers who have brought comfort during the passing of our loved one. Please know that your acts of kindness and love are cherished and will be long remembered.

### SERVICES ENTRUSTED TO
Pax-Villa Florida Funeral Home
770 N.W. 119th Street
Miami, Florida 33168
(305) 681-6122

### INTERMENT
Southern Memorial

JB'S GRAPHIC & PRINTING COMPANY. (305) 637-5171 - 1-(800)-462-6119

---

## HOUSE OF CLAY

*I have finished now with this house of clay,*
*Please kindly and gently lay it away;*
*And let me rest from this life of pain,*
*Toiling in sunshine, storms, and rain;*
*Trying to help the sick and poor.*
*And turning no needy from my door.*
*I have started to do my Master's work*

*Never a duty did I shirk;*
*Many times I was misunderstood*
*When I had done the best I could.*

*I am tired now, so let me rest.*
*Don't cry, don't you know, God knows best?*
*Please, no sad hearts, no hung down heads*
*Don't weep for me for I am not dead.*
*I have another house you know,*
*Where only God's redeemed can go.*
*I do not need this house of clay*
*So tenderly, carefully, lay it away.*



42

Case 2:05-cv-03613-DRH Document 4/6 Filed 06/ /07 Page 41 of 45 PageID #:

**IMPORTANT: USE THIS FORM ONLY WHEN THE CLAIMANT BECOMES SICK OR DISABLED WHILE EMPLOYED OR BECOMES SICK OR DISABLED WITHIN FOUR (4) WEEKS AFTER TERMINATION OF EMPLOYMENT. OTHERWISE USE GREEN CLAIM FORM DB-300.**

## PART B – HEALTH CARE PROVIDER'S STATEMENT (Please Print or Type)

THE HEALTH CARE PROVIDER'S STATEMENT MUST BE FILLED IN COMPLETELY AND THE FORM *MAILED TO THE INSURANCE CARRIER OR SELF-INSURED EMPLOYER, OR RETURNED TO THE CLAIMANT WITHIN SEVEN DAYS* OF THE RECEIPT OF THE FORM. For item 7d. give approximate date. Make some estimate. If disability is caused by or arising in connec with pregnancy, enter estimated delivery date under "Remarks."

1. Claimant's Name _FANOR        GERDA_   2. Age _66_  3. ☐ male  ☒ female

4. Diagnosis/Analysis  _Colon Cancer, Arthritis_  Diagnosis Code _153_
   - a. Claimant's Symptoms _G.I. Bleeding        Anemia_
   - b. Objective Findings _Pain hands_

5. Claimant hospitalized? ☒ Yes ☐ No   From _2/2004_ To _____ CPT Code _____
6. Operation indicated? ☒ Yes ☐ No   a. Type _2/2004_  b. Date _____
7. Enter dates for the following:

|  | Month | Day | Year |
|---|---|---|---|
| a. Date of your first treatment for this disability | 2 | 19 | 2004 |
| b. Date of your most recent treatment for this disability | | | 2004 |
| c. Date claimant was unable to work because of this disability | | | 2004 |
| d. Date claimant will be able to perform usual work _Cannot comment at this time_ (Even if considerable question exists, estimate date. Avoid use of terms: such as unknown or undetermined.) | | | |

8. In your opinion, is this disability the result of injury arising out of and in the course of employment or occupational disease?
   ☐ Yes ☒ No   If "Yes," has form C-4 been filed with the Workers' Compensation Board? ☐ Yes ☐ No
   Remarks: *(attach additional sheet, if necessary)* _____ (If disability is pregnancy related, please enter estimated delivery date.)

| I affirm that I am a | ☐ Chiropractor ☐ Dentist | ☒ Physician ☐ Podiatrist | ☐ Psychologist ☐ Nurse-Midwife | Licensed in the State of _New York_ | License Number _189588_ |
|---|---|---|---|---|---|

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD PRESENTS, CAUSES TO BE PRESENTED, OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, OR SELF-INSURER, ANY INFORMATION CONTAINING ANY FALSE MATERIAL STATEMENT OR CONCEALS ANY MATERIAL FACT SHALL BE GUILTY OF A CRIME AND SUBJECT TO FINES AND IMPRISONMENT.

Health Care Provider's Signature _Purna Atluri Muri, MD_
Health Care Provider's Name *(Please print)* _Purna Atluri Muri, MD_  Date _10/9/04_
Office Address _470_ Number _Clarkson Ave, Suite_ Street _1_ City or Town _Brooklyn NY_ State _11303_ Zip Code  Tel. No. _718 270 105_

## Employer's Statement

Employee's Full Name: _____    Policy Number: _____
Employee's Address: _____    S.S. Number: _____
Employee's Occupation: _____    Date of Birth: _____
Is employee a Union member? ☐ Yes ☐ No    Date employed: _____ ☐ Full Time ☐ Part Tim
If "Yes," is employee eligible for Union benefits? ☐ Yes ☐ No    Check days normally worked:

| | Mon. | Tues. | Wed. | Thurs. | Fri. | Sat. | Sun. |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

If Part Time, give particulars: _____
Date employee last worked: _____
Date employee returned to work: _____

Were wages continued during disability? ☐ Yes ☐ No
Were wages Sick pay? ☐ Yes ☐ No  From: ____ To: ____
Were wages Vacation pay? ☐ Yes ☐ No  From: ____ To: ____
Is reimbursement requested? ☐ Yes ☐ No
Is disability due to job? ☐ Yes ☐ No
If "Yes," has a compensation claim been filed? ☐ Yes ☐ No
Indicate Weekly Value of Board, Lodging and Tips: ____

| EARNINGS 8 WEEKS PRIOR TO DISABILITY (Including the week in which the disability began) | | | | |
|---|---|---|---|---|
| Month | Day | Year | No. Days Worked | Amount |
| | | | | |
| | | | | |
| | | | Total | |

Employer's Name: _____
Employer's Identification No.: _____
Percentage of Weekly Disability premium paid by employer _____ %.
(If blank, we will assume the employer pays 100% of the premium.)
Is employee enrolled in a Hartford Long Term Disability Plan? ☐ Yes ☐ No  If "Yes," effective date: _____
Based on the employer/employee premium contributions made over the last 3 years, what percentage of the Weekly Disability LTD _____ % benefit is considered taxable? *(See Section 7 of IRS Publication 15-A for information on determining the taxable percentage.)*
Is this employee currently covered by Social Security? ☐ Yes ☐ No  If "No," state grounds for exemption: _____

Address: _____    Telephone No.: _____
Signed by: _____    Title: _____  Date: _____

POLICE DEPARTMENT  ADMINISTRATIVE SUBMISSION  NEWARK, N.J.

| | | |
|---|---|---|
| **TO:** | Deputy Chief Robert P. Bauer | **DATE:** May 19, 2003 |
| | Commander, Office of Professional Responsibility | |
| **FROM:** | Sergeant Kimberly A. Wnek #6658 | **FILE REF:** INV 1 |
| | Internal Investigations | |

**SUBJECT:** <u>INVESTIGATION OF PERSONNEL #03-283</u>
 <u>COMPLAINT OF EXCESSIVE FORCE/IMPROPER SEARCH</u>
 <u>JULY 15, 2002</u>
 <u>EDWIN FRANCO</u>

<u>**DETAILS OF INVESTIGATION:**</u>  This writer received this investigation on March 10, 2003.

On March 4, 2003, complainant Edwin Franco responded to Internal Affairs to initiate a complaint of improper search/excessive force against Sergeant Michael LaTorre, and Police Officers Carlos Alvarado and Albert Lijo.

Edwin Franco had stated that on July 15, 2002, at approximately 1645 hours (4:45 p.m.), he was at his apartment, 167 Walnut Street, playing video games with three friends, Steven Marquinhos, Felipe Martins, and Karen Walters. Edwin at this time was 32 years old.

Franco had stated that the cited officers responded to his apartment and spoke with his roommate, Ismael Duran. The officers told Duran that they needed to speak with Franco.

Franco had stated that the officers walked into his bedroom, handcuffed him and escorted him to the marked police vehicle. Franco stated that while in the police vehicle, Officer Alvarado stated that he was arrested for threatening a victim with a weapon. Franco stated that **Officer Alvarado stated, "We found the shot gun shells, where are the fucken shotguns?"** Franco stated, "I don't't have a shotgun."

2

| | |
|---|---|
| SIGNATURE: _____ | SIGNATURE: _~~Kimberly A. Wnek~~_ |
| <small>SUPERIOR RECEIVING REPORT</small> | |
| DATE: _____ | RANK: _____Sergeant #6658_____ |
| <small>DPI1001</small> | <small>OS2270Police</small> |

44

POLICE DEPARTMENT        ADMINISTRATIVE SUBMISSION       NEWARK, N.J.

TO:    Deputy Chief Robert P. Bauer        DATE: May 19, 2003
        Commander, Office of Professional Responsibility
FROM:  Sergeant Kimberly A. Wnek #6658       FILE REF: INV 1
        Internal Investigations
SUBJECT: <u>INVESTIGATION OF PERSONNEL #03-283</u>
          <u>COMPLAINT OF EXCESSIVE FORCE/IMPROPER SEARCH</u>
          <u>JULY 15, 2002</u>
          <u>EDWIN FRANCO</u>

During this time, the officers escorted his three friends out of the bedroom and into the hallway, where they were patted down and field interrogated.

Franco had stated that Officer Alvarado grabbed him out of the vehicle and took him to the alley alongside of 167 Walnut Street. There, Officer Alvarado raised a pellet gun, belonging to Franco, and attempted to strike him on his head, while Franco was handcuffed and on his knees.

Franco yelled for his roommate, Ismael Duran, who came out and observed what was occurring. Alvarado then walked back inside the house, then made Franco sign a Consent to Search form after his bedroom had been searched.

Franco was arrested for Aggravated Assault, Possession of Weapon, and Possession of Weapon for Unlawful Purpose.

On March 10, 2003, this writer sent contact letters to Edwin Franco, Ismael Duran, and Anthony Joana, via certified mail.

On March 10, 2003, this writer telephoned Edwin Franco and arranged a date for his video statement, March 13, 2003.

3

SIGNATURE: _____    SIGNATURE: _Kimberly A. Wnek_
     SUPERIOR RECEIVING REPORT

DATE: _____        RANK: _____Sergeant #6658_
DPI1001
                                           OS1270Police

POLICE DEPARTMENT       ADMINISTRATIVE SUBMISSION       NEWARK, NJ

| | | | |
|---|---|---|---|
| TO: | Captain Richard P. Maguire<br>Commander- Office of Professional Responsibility | DATE: | December 20, 2001 |
| FROM: | Sergeant Joanne Y. Kosa<br>Office of Internal Affairs | FILE REF: | INV 1 |
| SUBJECT: | INVESTIGATION OF PERSONNEL #01-1618<br>RE: EXCESSIVE FORCE<br>CROSS REF: IOP#01-1614 | | |

**OFFICER/S INVOLVED:**       **P/O CARLOS ALVARADO    ID#9051    ED**
                                      **P/O ALBERTO LIJO       ID#8052    ED**

**SUMMARY:**

On November 12, 2001, a complainant identified as **Reinaldo Negron, H/M/20,** responded to the Office of Professional Responsibility along with William **Pagan, H/M15.** Mr. Negron made a complaint of **Excessive Force** by an unknown H/M Newark police officer. Mr. Negron reported that while he was doubled parked at 39 Oxford Street waiting for friends, his vehicle was approached by (2) Newark Police Units. He further stated that he was ordered out of his vehicle, at gunpoint, struck on the back of his neck with the weapon, and ordered on the ground. He complained of being poked in his ribs with the weapon. As per Mr. Negron, the officers then searched his vehicle and were called away after hearing a call on the police radio for Oxford Street. The officers then left the scene. (CROSS REF: IOP#1614—CC#01-110035)

Sergeant Julio Rubbet conducted the Preliminary Investigation. Mr. Negron consented to giving a videotaped statement. He was unable to identify the officers involved in the incident upon viewing the OOPR Photo Books. He and Mr. **Pagan** were photographed a showed minor injury to their faces. Videotape submitted to OOPR Main vault. (REFER TO PRELIMINARY REPORT FOR DETAILS OF PRELIMINARY INVESTIGATION.

**FINDINGS:**       **EXONERATED: I find the officer' actions were legal, justified and proper.**

**RECOMMENDATION:**       I recommend no further action in this matter.

*Joanne Y. Kosa*

SIGNATURE:_____    SIGNATURE:_____ Joanne Y. Kosa _____    i
          Superior Receiving Report

DATE:_____    RANK:_____ Sergeant, #6182 _____
DPI: 1001                                                           OS2270Police

TO:    Acting Deputy Chief Barry Colicelli          DATE:    6/17/00
      Commanding Office of Internal Affairs
FROM:   Sergeant William A. Sanchez           FILE REF:
      Office of Internal Affairs
SUBJECT: Excessive Force

## Preliminary Investigation

On 6/17/00 while at the Office of Internal Affairs conducting a preliminary investigation on a police pursuit I received a phone call from Norma Fonseca. She stated she was arrested on 6/16/00 and that she was improperly arrested and treated on 6/16/00. I instructed her to respond to Internal Affairs for a statement and to look through photos.

Ms. Fonseca arrived at Internal Affairs where she provided me with copies of two summons sheet. The sheets indicate she was arrested on 6/16/00 by officer Carlos Alvarado for disorderly conduct and resisting arrest. I looked trough our files and found officer Carlos Avalrado's identification number is 9051. An array of this officer could not be compiled since he is currently not in our photo books. Ms. Fonseca displayed a bruise to her right hand and stated she also injured her right knee during the arrest. I took photos of her hand and of her hand.

In summary Ms. Fonseca stated she sells ice-cream at Broad and Market from a pushcart. On 6/16/00 she observed the officer approach another lady, who's name and information she does not have, and converse with her. He later approached her and in Spanish told her he was fed up with the problems she and the other vendor were having. **Ms. Fonseca asked if she could explain but the officer declined to listen** to her and took her vendor's license from around her neck and told her to follow him. She followed him to the booth located on Broad and Market and both entered it. While inside the **officer grabbed her hand and pulled on it at which time she told him to let go** of her and that she was pregnant. Ms. Fonseca pulled her arm from the officers grip and told him to let her go and not to grab her. Once again the officer grabbed her arm, pulled something out and **sprayed her on the face (mace).** After being maced the officer handcuffed her behind her back. The complainant states she became desperate and couldn't breath. **Both she and the officer exited the booth where she fell to the ground on her right side.** The officer attempted to help her up and in doing so either stepped on her right leg or struck it, (she doesn't imply the officer purposely kicked her). After getting up she and the officer re-entered the booth where she told him her face was hurting. **She was allowed to stick her head out of a small window where the officer poured water on her face and eyes.** Several other persons also poured some water on her face. The arresting officer called for another unit to arrive and Ms. Fonseca was placed inside the patrol vehicle. After placing her inside the officer closed the door and remained outside for approximately five minutes speaking with other persons. **Ms. Fonseca began kicking the door and window in an attempt to get the officer's attention.** She stated she was having difficulty breathing and wanted the officer to open the windows. The officer re-entered the auto along with the driver and Ms. Fonseca was taken to the East District Command. At the

SIGNATURE: _____     SIGNATURE: _____ William A. Sanchez____
           SUPERIOR RECEIVING REPORT
DATE: _____             RANK: _____ Sergeant ID#6800 ____
DP11001
                                                                        OS2270Police